David **RENTERIA**, Appellant,

v.

The **STATE** of Texas.

No. AP–74829.

Court of Criminal Appeals of Texas.

Oct. 4, 2006.

Rehearing Denied Nov. 22, 2006.

---

Scott Segall, El Paso, for appellant.

John L. Davis, Asst. D.A., J. Landon K. Schmidt, Asst. D.A., El Paso, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

HERVEY, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

A jury convicted appellant of murdering a child under the age of six years. The trial court sentenced appellant to death pursuant to the jury's answers to the special issues submitted at the punishment phase. Appellant raises twenty-two points of error in this direct appeal. We will affirm in part and reverse in part.

Appellant was a 32 year-old registered sex offender on probation for committing an indecency offense against an eight-year-old girl when he was arrested for the murder of the five-year-old girl in this case. On November 18, 2001, this five-year-old victim disappeared from a Wal–Mart store where she was shopping with her parents. The next day, her nude, partially burned body with a partially burned plastic bag over her head was discovered in an alley sixteen miles from the Wal–Mart. When she was set on fire, she already had been manually strangled. The medical examiner testified that the victim also received two blows to her head. The medical examiner also testified that the victim could have been sexually assaulted, although he found no physical evidence of sexual assault.

Appellant's palm print matched a latent palm print that was lifted from the plastic bag covering the victim's head. A search of appellant's van revealed blood stains containing the victim's DNA. Appellant and his van were at the Wal–Mart when the victim disappeared. A Wal–Mart security guard briefly spoke to appellant, and Wal–Mart surveillance cameras showed a man wearing a light-colored hat, a dark shirt, and dark shorts walking out with the victim. Earlier that day appellant, wearing clothes very similar to those worn by the man walking out of the Wal–Mart store, had been at a nearby Sam's store with his father. While at Sam's, appellant purchased oranges, and the victim's autopsy revealed pieces of orange wedges in her stomach.

Appellant was arrested on December 3, 2001, and he gave a written custodial statement to the police. This statement was not admitted into evidence at appellant's trial. In this statement, appellant claimed that an "Azteca" gang member nicknamed "Flaco," whom appellant had known in jail, and several other persons, whom appellant did not know, were primarily responsible for the victim's murder. Appellant claimed that he helped these people commit the offense out of fear they would harm his family. He also claimed that his involvement in the offense was limited to luring the victim out of the Wal–Mart and helping "Flaco" and the others dispose of and burn her body after the others had murdered her. At the end of his December 3rd statement, appellant made what he characterizes as an expression of remorse.[1] Appellant stated:

> First of all, I want to mention my deepest sympathy for the family. It is a tragedy that should never have happened, young or old. I want to say that my participation in this was due to the fact that I was in fear of my family's life. These guys just knew too much and they came at me full force. I was just looking for a way for my family not to be hurt. God I wish there was something I could do to make this different for everybody. Right now I am just hoping that my family will be protected from those that attempt to harm them. I am right now feeling deep confusion and not knowing what other person would have done in my shoes or circumstances. I

hope that the individuals responsible are brought to justice. I hope that somebody out there does know a little bit more about this and does come out and forth.[2]

Appellant argues in his sixth point of error that he was denied the protections of the Sixth and Eighth Amendments and the Fourteenth Amendment's due process clause when, at the punishment phase of trial, the trial court would not permit him to use this remorse evidence during cross-examination of a State expert witness. The record from the punishment phase reflects that the State presented the expert testimony of Dr. Gripon, who testified, based on supported-by-the-record hypotheticals, that a person like appellant would be a future danger to society in part because this hypothetical person was unremorseful.

> [THE STATE]: Now, what does it say about the hypothetical person [sic] regards to his feeling regarding others, the value of another person's life and being remorseful when the hypothetical person is—at nine o'clock the night of the violent murder is going to a convenience store only six-tenths of a mile from his house where he purchases two 32–ounce cans of beer?
>
> [DR. GRIPON]: Well, assuming that that person appears no different than they normally do, it would raise the question as to rather [sic] what they've done has had any significant impact on them. So it would raise the question of

---

1. *See Thomas v. State*, 638 S.W.2d 481, 484 (Tex.Cr.App.1982) (contrition and remorse connote "sincere sorrow for sin, wrongdoing or offense") (internal quotes omitted); *Webster's II New Collegiate Dictionary* at 938 (1999) (defining remorse as "[m]oral anguish and bitter regret arising from repentance for past misdeeds"); *Roget's Desk Thesaurus* at 450 (2001) (remorse is, among other things, "feelings of guilt").

2. The State's trial theory was that appellant, who was a complete stranger to the victim, committed the offense alone. No evidence presented at trial (including the Wal–Mart surveillance videos) supported appellant's claim in his December 3rd statement that others were involved in the offense.

whether the person feels remorseful or has any concern to any significant degree as to what they've done.

That's not a lot of information, and you don't have a lot to work with there, so that's kind of limited. But certainly it appears as though they're going on with their normal day-to-day activity even though they've had a rather extraordinary day.

[THE STATE]: Okay. Well, let me compound that with the morning after—after the violent murder the hypothetical person's probation officer pays him a visit, and she observes his behavior and sees nothing different than any other day.

[DR. GRIPON]: Well, that person would either have to be very well controlled and very well contained or have very little emotion generated by the actions of the day before. And I guess one conceivably—it's possible one could be that good an actor. But it really more reasonably raises the question as to really did all that have the impact that one would expect or probably hope for, but he would certainly lead you to believe that the events that preceded that didn't seem to have great impact on the individual.

\*　　\*　　\*　　\*　　\*　　\*

[THE STATE]: If I could just go back to the question regarding remorse. I talked to you about an incident at the 7–Eleven—at the convenience store; I'm sorry—at the convenience store and then the day after with the probation officer. And now 11 days after where the hypothetical person speaks with his therapist, and the therapist's observation is she finds him to be no different than any other day. What does that tell us about him being remorseful?

[DR. GRIPON]: Well, it tells us that at least outwardly there was no expression of anything that one could read or believe to be remorse, that that person appeared as best as that individual—and I don't know what their degree of assessment might be—but to the degree that they could assess them, and they knew them from before, that they appeared no different than they did before which would make you believe or lead you to believe or question whether there was any remorse.

The defense wanted to use the remorse evidence during its cross-examination of Gripon for the purpose of asking whether Gripon's opinion would change if the hypothetical person had expressed remorse. During a lengthy hearing outside the jury's presence on the admissibility of the remorse evidence, the defense claimed that the State had opened the door to its admission because the State's questioning of Gripon left the jury with a false impression that appellant had not expressed remorse (for example, the defense claimed that "since they have opened the door to claiming that he has never shown any remorse we are requesting that that statement come in and be able to cross-examine the doctor about the impact of that statement of his statement that there's no remorse"). The defense also claimed that, even if the State had not opened the door to the remorse evidence, this evidence nevertheless met the test of "relevancy" rendering it admissible, as a matter of federal constitutional law and as a matter of state statutory law, without regard to whether any other evidentiary rule (such as hearsay) excluded it (for example, the defense claimed "that the rules of hearsay do not apply in keeping out relevant information in front of this jury"). The trial court excluded the remorse evidence, but ruled that the defense could ask Gripon hypothetical questions concerning remorse.

The defense elicited testimony from Gripon that an expression of remorse by the hypothetical person "within, say two weeks of the alleged incident" would be "looked upon favorably, and it would tend to humanize this hypothetical individual, and it would tend to be a positive thing as opposed to the absence of remorse."

[DEFENSE]: All right. And with respect to this hypothetical person in the hypothetical question, if that person had shown some remorse within, say, two weeks of the alleged incident—or the hypothetical incident, would that change your perspective at all?

(The State objected to this question and the trial court overruled the State's objection)

[DR. GRIPON]: Well, you would have to consider that certainly. It might not change the—because there are many factors that play into whatever might have [sic] regarding that. But certainly, remorse would be looked upon favorably, and it would tend to humanize this hypothetical individual, and it would tend to be a positive thing as opposed to the absence of remorse.

During its closing jury arguments, the State emphasized that its hypothetical to Gripon was "complete" and later emphasized that appellant had not expressed "the slightest bit of remorse."

[STATE]: Let's just take a look at what Dr. Gripon said. That hypothetical was complete. If there had been something wrong with the hypothetical, they would have attacked it. But there was nothing wrong.

[DEFENSE]: Your Honor, we did object at the bench, as the Court well

knows. For him to indicate we did not is to mislead the Jury.

[THE COURT]: Let me instruct the Jury that what the attorneys say, especially during argument, is not evidence. The evidence that you are to consider that is valid evidence comes from the witness stand and the testimony from the witness and the exhibits.

[DEFENSE]: Your Honor, we thank you for the instruction, but we respectfully move for a mistrial.

[THE COURT]: Denied.

* * *

[STATE]: And when I look at the whole picture and I think about the needlessness of taking her-and this really cute picture of her, I think she's playing in the mud there. When I look at this little baby and think of the senselessness of this killing, if he had any conscience, there would be even the slightest bit of remorse, the slightest bit of remorse, but we know from his actions and the testimony that he had none. I mean, what Dr. Sorenson[3] didn't need, we need. We need to know.

And what did he do? That night he bought a couple of beers. Now, that sounds to me like he's troubled. I'm so sarcastic. It seems to me like for him it's just like Miller time. He could care less. Could care less. And then the next day, just by chance, his probation officer comes by and it's as if it's nothing. And you can look in the chronos. You can read her notes. It's like page 3 here. 11/19. It's in blue. Now, she doesn't know anything different. Her testimony is that she didn't see anything different, but she doesn't note anything different.

---

**3.** Sorenson was a defense expert who, according to defense counsel's closing argument, testified that he was 95% sure that there was only a 9.4% probability that a life-sentenced appellant would "commit some sort of violent criminal offense while in prison over the next 40 years."

We understand appellant to argue on appeal, as he did at trial, that the State opened the door to the admission of the remorse evidence which, solely because it meets the test of "relevancy," was admissible without regard to whether any other rule of evidence, such as hearsay, would exclude it.[4] We understand the State to argue that it did not open the door to the admission of the remorse evidence and that this evidence is inadmissible hearsay even if it does meet the test of "relevancy."

■ This Court has decided that the federal constitution does not require admission of a defendant's self-serving, out-of-court declarations of remorse when they are inadmissible under state law even when these declarations meet the test of constitutional "relevancy." *See Lewis v. State*, 815 S.W.2d 560, 568 (Tex.Cr.App. 1991) (defendant's hearsay expressions of remorse not admissible at punishment phase of capital murder trial); *Thomas*, 638 S.W.2d at 484 (defendant's self-serving hearsay declarations offered by defendant in mitigation are ordinarily inadmissible). In *Lewis*, 815 S.W.2d at 568, this Court explained:

> Although the Eighth Amendment to the United States Constitution assures that no person shall be put to death without opportunity to bring before the sentencing authority all evidence of mitigating circumstances, the Constitution does not assure that the evidence be received in a form which is otherwise objectionable. Remorse following commission of a serious crime may well be a circumstance tending in some measure to mitigate the degree of a criminal's fault, but it must be presented in a form acceptable to the law of evidence before he is entitled to insist that it be received over objection.

The Supreme Court's decision in *Tennard v. Dretke*[5] is not to the contrary. There, the Supreme Court addressed only the constitutional "relevancy" of a hearsay reference to a defendant's IQ score contained in an old prison document that was admitted into evidence without any objection from either party. *See Tennard*, 542 U.S. at 277, 124 S.Ct. 2562; *Ex parte Tennard*, 960 S.W.2d 57, 59 (Tex.Cr.App. 1997). Neither party in *Tennard* made an issue of whether this evidence was "otherwise objectionable" under state law. *Tennard* does not categorically require the admission of evidence that meets some standard of constitutional "relevancy" when it is "otherwise objectionable" under state law.

■ We nevertheless agree with appellant that, through its questioning of Gripon, the State opened the door to the admission of the remorse evidence to correct a false impression for which it was responsible. *See generally Wheeler v. State*, 67 S.W.3d 879, 880–85 (Tex.Cr.App. 2002). The record fairly reflects that the State's questioning of its expert (Gripon) left the jury with the false impression, later emphasized by the State during closing arguments, that appellant had not expressed any out-of-court declaration of remorse. *Compare Thomas*, 638 S.W.2d at 484 (State's jury argument that defendant

---

4. Appellant does not claim that the State improperly placed before the jury evidence of his lack of remorse. *See Thomas*, 638 S.W.2d at 483–85 (prosecutorial unsupported-by-the-record comment on defendant's lack of remorse may be impermissible comment on defendant's failure to testify); *Moore v. State*, 849 S.W.2d 350, 351, 352 (Tex.Cr.App.1993) (Baird, J., concurring to refusal of appellant's discretionary review petition) (when there is no evidence in the record suggesting the defendant's lack of remorse, a comment upon the lack of remorse is a direct impermissible comment on defendant's failure to testify).

5. 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

expressed no remorse was improper because the prosecution faulted defendant for not doing what the law did not permit him to do).[6] The remorse evidence was, therefore, not "otherwise objectionable" under state law. *See Lewis,* 815 S.W.2d at 568. And its exclusion rose to the level of constitutional error because it meets *Tennard's* low threshold for constitutionally relevant mitigating evidence.[7] In addition, with the State having opened the door to appellant's remorse evidence, the exclusion of this evidence violated due process by preventing appellant from rebutting the State's evidence and argument that appellant was unremorseful.[8]

■ And, although we suspect that appellant's belated, in-custody expression of remorse made in the context of minimizing his responsibility for the offense would not have altered the jury's punishment verdict,[9] we are unable to so conclude beyond a reasonable doubt. Tex.R.App. P. 44.2(a) (setting out harmless error standard for constitutional error requiring a reversal unless appellate court determines beyond reasonable doubt that the error did not contribute to the punishment). The State's claim that appellant made no out-of-court statement of remorse was not an insignificant portion of its punishment case against appellant. Point of error six is, therefore, sustained.

■ In appellant's first and second points of error, he argues that the trial court erred in denying him a continuance based on the ground that the State failed to timely disclose evidence meeting the materiality standard of *Brady v. Mary-*

---

**6.** We note that the three-judge lead plurality opinion in *Kipp v. State* states that opening the door to or inviting evidence pertaining to an otherwise inadmissible subject matter does not mean that such evidence is admissible in any form including hearsay. *See Kipp v. State,* 876 S.W.2d 330, 337 (Tex.Cr.App.1994). *Kipp* nevertheless acknowledged two examples where "hearsay testimony could be viewed as being invited." *See Kipp,* 876 S.W.2d at 337 n. 11 (discussing rule of optional completeness and hearsay used to establish probable cause). This case, we believe, presents another example where hearsay testimony was invited because, through its direct examination of Gripon, the State conveyed to the jury that appellant made no expression of remorse. Permitting appellant to respond to this with his hearsay expression of remorse would not have strayed beyond the scope of the State's invitation. *See Feldman v. State,* 71 S.W.3d 738, 755–56 (Tex.Cr.App.2002) (a party who opens the door to otherwise inadmissible evidence risks having that evidence admitted against him; however, the party offering the evidence may not "stray beyond the scope of the invitation"). In other words, if the State claims that a defendant made no hearsay statement of remorse, the defendant should be permitted to respond that he did make a hearsay statement of remorse.

**7.** *See Tennard,* 542 U.S. at 284–87, 124 S.Ct. 2562 (constitutional question is whether the evidence is of such a character that it might serve as a basis for a sentence less than death); *Lewis,* 815 S.W.2d at 568 (recognizing that a defendant's hearsay declarations of remorse "may well be a circumstance tending in some measure to mitigate the degree of a criminal's fault").

**8.** *See Smith v. State,* 898 S.W.2d 838, 850–53 (Tex.Cr.App.1995) (it violates due process to execute a defendant on the basis of information which he had no opportunity to deny or to explain); *Skipper v. South Carolina,* 476 U.S. 1, 9–15, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (Powell, J., concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.) (defendant's death sentence should be vacated, not because the trial court excluded "relevant mitigating evidence," but because the defendant "was not allowed to rebut evidence and argument used against him") (internal quotes omitted).

**9.** *Cf. Singletary v. State,* 509 S.W.2d 572, 578 (Tex.Cr.App.1974) (defendant's exculpatory statement made after his arrest "becomes obnoxious as self-serving when the opportunity for reflection arises and fabrication is manifested to suit the exigencies of his situation").

*land,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See also Little v. State,* 991 S.W.2d 864, 866 (Tex.Cr.App. 1999) (exculpatory and impeachment evidence is material if its effective use may make the difference between conviction and acquittal). The granting or denying of a motion for continuance is within the sound discretion of the trial court. *Heiselbetz v. State,* 906 S.W.2d 500, 511–12 (Tex. Cr.App.1995). A defendant must show "specific prejudice to his defense" to establish that the trial court abused its discretion in refusing to grant a continuance. *See id.*

Appellant made several requests for a continuance just before the scheduled trial date. The defense requested a continuance because the State had just disclosed problems with the FBI laboratory involving DNA testing in other cases. The State responded that these problems did not affect the DNA results in this case because the laboratory technician in the other cases was not the laboratory technician who worked on appellant's case.[10]

The defense also requested a continuance based on the State's delay in producing over 400 pages of Crime Stopper tips and in failing to timely disclose that the victim's mother was the ex-wife of a leader in the Azteca prison gang. Appellant claimed that this prevented him from adequately investigating whether the victim's murder may have been gang-related, as suggested in appellant's December 3rd statement. The State claimed that it had recently learned that the victim's mother was the ex-wife of an Azteca prison gang leader. The State also asserted that the marriage had ended over ten years before and that the ex-husband of the victim's mother was not an Azteca gang member when they were married. The State also asserted that the victim's family members had stated that there were no ill feelings or problems arising out of the marriage.[11]

We set out relevant portions of the record where defense counsel explained the reasons for requesting a continuance.

[DEFENSE]: Your Honor, the-we filed a first motion of not ready because we had what we thought were some outstanding *Brady* materials that we had not received. That was the first motion. Since we filed that motion, the State brought us a stack of information. The first part of the stack of information was a number of reports that the State had received over the last year about the issue of problems in the FBI Lab. And it concludes that the FBI Lab problems did not affect the results in this particular case. We have, of course, had no time whatsoever. We received this today, today. In order to verify that in

---

10. We also note that Jennifer Luttman, a forensic DNA examiner for the FBI, testified at appellant's trial that there had been an individual in the laboratory who was not running controls to completion, and every case that individual worked on (some 100 cases) was being re-worked. Luttman testified that this individual did not work on appellant's case and that all testing protocols were followed in appellant's case. Luttman testified that she had complete confidence in the DNA test results in appellant's case.

11. We also note that the victim's mother testified outside the jury's presence at trial that she had not seen her ex-husband in 18 years and that she did not know "if he was ever a member of any prison gang."

Q. [DEFENSE]: When was the last time you had some contact with him?
A. [VICTIM'S MOTHER]: About 17, 18 years ago.
Q. Are you aware that he listed you as his wife as late as 1996 in the-in the jail records?
A. No, I did not know.
Q. He never contacted you during that whole time period?
A. No.

point of fact their conclusions that the DNA problems did not affect this case, the FBI Lab did not affect this particular case, we have had absolutely no opportunity to verify or not verify that claim.

Much more troubling, and the subject of the second motion, was that we received information yesterday from a private source and official notification less than four hours ago that the mother of the victim in this particular case had a ten-year relationship with an Azteca Gang member. The Court, I'm sure, has read the confession of the defendant in which he says that this was an Aztec [sic] Gang hit rather than a sexual assault. This information, I have no doubt in my mind, was not privy to the District Attorney's Office until probably immediately before it was given to us. No doubt in my mind whatsoever. We had heard this rumor yesterday from the gang investigators in El Paso County, which tells me that this information has been out there and has been in the possession of the State of Texas, although not the District Attorney's Office, for quite some time. That it is clearly exculpatory information that should have been turned over first to the District Attorney's Office and then to us long ago.

Now, here is the box that I find myself in and the reason for the continuance. There are two different ways of defending this case. I do not know which one is first off, the one based on truth and correctness because of this new information. It may well be totally true and correct what my client says in his statement and I can now perhaps prove it to be true, or it may not be. And I don't know, as I am standing here today, which it is. And I am supposed to pick a jury starting tomorrow and interview them and present to them a theory of

defense without having a clue as to what my theory of defense really would be if I knew the truth. I have to investigate this rumor. And what's going to happen is either it's going to get investigated between now and when we start the trial of this case or it's going to get investigated after this case is tried. Because I will not and cannot give this man effective assistance of counsel in the picking of this jury and at the same time be running down this new information, finding an expert to explain this gang. Finding the witnesses to prove up the information that I have been given. I can't do both. My team, which is very good, cannot do both. And so the result is that I have to let something slide and it will be the investigation of this case, because I am going to come to this Court. I am going to do the best I can with that voir dire but it's going to be wrong. It's going to be ineffective and this case is going to get reversed and retried when a new lawyer comes on, finds the new data and say [I] didn't do a good investigation. And I'll have to agree with him. Because we didn't know this information about this lady until today, less than twenty-four hours before I am supposed to start voir dire.

[THE COURT]: All right. The information got to you somehow other than the District Attorney's Office?

[DEFENSE]: We heard a rumor.

[THE COURT]: And the District Attorney's Office did not have that information and hide it from you, did they?

[DEFENSE]: Not to my knowledge. And I will not make that representation without any basis. I assume good faith on the part of the fine members of the District Attorney's Office. But this was information that was in the hands of the State of Texas, of the investigative units. So the Court will understand, this is a

rumor we got through the jail. The jail has been giving us rumors on this case ever since the first day this case started. And we have tracked down some of those rumors. One of those rumors that we tracked down turned out to be emanating from a guy who was a schizophrenic, inhalant abuser and totally worthless. Yesterday we got a rumor that the mother of the child was married to a lieutenant in the Azteca Gang. And before I had even a chance to determine whether this rumor was any better than the rumors we got from the schizophrenic, we got the official notice. However, the DNA stuff was dated as long as a year ago.

\* \* \*

[DEFENSE]: —Your Honor, and basically each jailing I looked under who [the victim's mother's ex-husband] was married to and up until '93, '94 and maybe even '95, he had claimed [the victim's mother] as his spouse. I believe it was '96, he—there was a "u" which I assume is unknown and then '97 is when he finally claimed that they had divorced. And by "he," I am talking about this Azteca Gang member which [the victim's mother] allegedly had this relationship with. So from what we have gathered in the last, this afternoon, there are—this guy did have a relationship. He had her name tattooed on his body. He put "Mi Amor" on his body next to her name. And so we feel like this is something we need to investigate. We don't know what kind of relationship, rocky or not, that they had, Your Honor, jealous or not, that they had.

[DEFENSE]: That being the reason for the continuance request is that it may well be and prove out upon further investigation that the bottom line turns out as the State believes it to be.

It is my job as defense counsel, my only job really as defense counsel, is to verify or challenge that. I cannot do so tomorrow, starting tomorrow morning. And the lawyers who are working on this case, I need them in the courtroom. I cannot send them forth to do my other half of my job while trying to do the voir dire. If this case were less than a death penalty case, it would be one thing. But this is a death penalty case that should we lose this case there will be a subsequent investigation that will take as long as they need to take to determine whether I did a good job; whether I investigated this case properly or not or whether other information was not present. And the result of that has been historically that trials have been set aside. The Supreme Court set aside one for failure to investigate not more than seven days ago.

[THE COURT]: Let me ask you this: From what I am hearing you say are you representing to this Court that if I don't give you the continuance that you and your office will not investigate this new information?

[DEFENSE]: I can't investigate this new information. I can't do it. My office, which [appellant] is fortunate to have an office with a large staff, would most certainly try to do so but here is the problem. Is it—let's assume for a moment that the evidence turns out the way I believe, believe based on a mere belief rather than on knowledge—if it turns out to be that this was in fact not a stranger abduction then I have to voir dire this jury totally different than if this were in fact a stranger abduction. That's my entire theory of defense, how I present this to the jury panel is going to be totally different than it would be one way. Because for instance, there are two types of experts that I have not neither located, talked to or otherwise

even interviewed that this information now raises that I should. Specifically, a gang expert to sit there and tell me whether or not this man would have the ability to order a gang hit or not. I don't know whether that's true or not. Mythology says it's true. I don't know. I have no expert to say that it's true or whether it's not true. I have people who have examined the defendant and have talked to me about future dangerousness and have talked to me about stranger-upon-stranger and other such things. And they have run up on certain theories that I have presented to them and given me their opinions. Their opinions, they told me, would be totally different if the facts in the case were different from the way in which I've portrayed this case to them. And so I don't know how to try the case. And one of first things I learned in criminal defense is you don't get up in front of a jury panel without a theory of defense, without knowing where you're going, without knowing the facts of the case. I don't know the facts of this case. I thought I did. I thought I knew them as of yesterday, as of this morning at 10:00 in the morning. I thought I knew what this case was all about. I don't anymore.

The State responded, among other things, that the ex-husband of the victim's mother was currently incarcerated in Louisiana on federal charges and that he had been incarcerated since late 2000, including when this crime occurred. The defense responded:

[DEFENSE]: Which is the point; is that we don't know whether that is a significant fact or a completely insignificant fact when it comes to these gangs. If I understand what I watch on television to be true, that's significant. Is that, you know, gang leaders run gangs from inside the prison just as effectively

as they run them outside the prison, perhaps. And finally, you know, [the State] avoids the key issue, I think, which is, can I effectively represent this man during the critical stage of voir dire without knowing what the facts are of this case. And the answer is, no, I can't.

This record fairly reflects that defense counsel was prepared to defend this case as a stranger-upon-stranger abduction and that the denial of the continuance did not prejudice this particular defense. The record also reflects that defense counsel knew that appellant had claimed in his December 3rd statement, approximately two weeks after the offense and long before trial, that the victim's murder was gang-related. On this record, we hold that defense counsel did not make the required showing of specific prejudice from the denial of a continuance based on the assertions (1) that he could not adequately investigate speculation, of which the defense was already aware, that the victim's murder might have been gang-related based on a marital relationship that ended years before the commission of this offense, and (2) that he could not adequately investigate the speculation that there might have been problems with the DNA testing in this specific case because of problems in unrelated cases. Case-law requires more than this type of speculation to justify an appellate reversal of a case for a trial court's failure to grant a continuance. *See Heiselbetz*, 906 S.W.2d at 512 (bare assertion that counsel did not have enough time to interview potential witnesses does not alone establish prejudice). The same analysis applies to any claim of inadequate time to investigate the Crime Stoppers tips. On this record, we are unable to conclude that the trial court abused its discretion to deny appellant's motion for a continuance. *See id.* (granting or denying of motion for continuance is within trial court's sound dis-

cretion). Points of error one and two are overruled.

█ Appellant argues in his third point of error that the trial court erred in not suppressing the fruits (blood containing the victim's DNA) of a search warrant pursuant to *Franks v. Delaware.*[12] Appellant argues on appeal that the police recklessly or intentionally omitted material facts from the search-warrant affidavit. The record reflects that when the police initially questioned appellant at his home on November 20th, they made a cursory search of appellant's van. This cursory search of appellant's van was done late at night and did not reveal any incriminating evidence. When the police arrested appellant on December 3, 2001, they obtained a search warrant for his van. A search of appellant's van pursuant to this warrant uncovered evidence of small blood stains, which DNA testing revealed belonged to the victim.

In his brief, appellant sets out the following information that was in the search-warrant affidavit:

a. That a child had been abducted.

b. The child was found dead many miles away, the next day

c. The child had been strangled, and then burned.

d. That the child's head had been injured and had bled.

e. The child's clothing had not been recovered.

f. That the defendant had been interviewed

g. That the defendant had been at the Wal–Mart at the time in question

h. That a VEHICLE registered to the defendant had been at Wal–Mart at the time in question

I. The defendant's print had been found on a bag on the child.

j. The defendant is a registered child sex offender

In his brief, appellant claims that the following information was omitted from (and should have been included in) the search-warrant affidavit.

a. That two officers had searched the van in question at the time of the interview of the defendant [on November 20th] for the very items now sought [citation to record omitted]

b. That the officers had not found any of the items sought to be found with this warrant. [citation to record omitted]

c. That the officers found no evidence linking this van with the crime, specify [sic] that they saw no bloodstains, or any other workable evidence. [citations to record omitted]

d. That the defendant claimed that the van was not running at the time of the search, which was 49 to 52 hours after the crime. [citation to record omitted]

e. That there was no evidence that the child had been sexually molested.

Appellant claims that, had this information been included in the search-warrant affidavit, the magistrate would not have had probable cause to issue the warrant. The record, however, reflects that appellant did not present this specific claim to the trial court. The record reflects that he

---

12. 438 U.S. 154, 156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In order to obtain a Franks evidentiary hearing, the defendant must: "(1) allege deliberate falsehood or reckless disregard for the truth by the affiant, specifically pointing out the portion of the affidavit claimed to be false; (2) accompany these allegations with an offer of proof stating the supporting reasons; and (3) show that when the portion of the affidavit alleged to be false is excised from the affidavit, the remaining content is insufficient to support the issuance of the warrant." *Cates v. State,* 120 S.W.3d 352, 356 (Tex.Cr.App.2003).

complained only of material misrepresentations in the search-warrant affidavit and not of any material omissions. In any event, assuming that *Franks* applies to omissions, the magistrate would have had probable cause to issue the warrant even with the inclusion of the information that appellant claims should have been included in the search-warrant affidavit.[13] The search-warrant affidavit still would have contained information that appellant was at the Wal–Mart when the victim disappeared and his palm print was found on the bag covering the victim's head. Appellant's third point of error is overruled.

 In appellant's fourth point of error, he argues that the trial court erred in not submitting to the jury the issue of whether his palm print was obtained illegally under TEX.CODE CRIM. PROC., Article 38.23(a). Such an instruction is required only if there is a factual dispute about how the evidence was obtained. *See Garza v. State,* 126 S.W.3d 79, 85 (Tex.Cr.App. 2004).

Here, there is no factual dispute about how the police obtained appellant's palm print. On November 20th, appellant voluntarily went with two police detectives (Martinez and Pantoja) to the police station where he agreed to provide his prints and then he was driven home. The evidence shows that these officers were also aware of an outstanding arrest warrant for appellant for a traffic offense. These officers, however, did not arrest appellant pursuant to this outstanding warrant. When the officers dropped appellant off at his home, they told him that he should take care of the outstanding arrest warrant.

We understand appellant to claim that the existence of the outstanding arrest warrant raised a fact issue on whether he was under arrest when he agreed to provide his prints. The evidence, however, is undisputed that the police did not execute this warrant. The undisputed evidence otherwise supports a finding that appellant voluntarily went with the police officers to the police station and provided his prints. Appellant's fourth point of error is overruled.

 Appellant claims in his fifth point of error that the trial court denied him due process by not permitting him, under the rule of optional completeness, to introduce into evidence at the guilt phase of trial his December 3rd written statement to the police. During the guilt phase of trial, detective Martinez testified about appellant's November 20th noncustodial oral statements to Martinez and Pantoja at the police station. Martinez testified that appellant told them, among other things, that he went to Wal–Mart to purchase "stuff" for chili his 18–year–old wife was making and that he had a brief encounter with a Wal–Mart security guard in the parking lot around the time the victim disappeared. On cross-examination by the defense, Martinez testified that appellant denied any involvement in the victim's murder. The trial court did not permit appellant to introduce his December 3rd written statement under the rule of optional completeness to correct, what appellant claimed, was a false impression left by the State.

Appellant argues on appeal that the State's examination of Martinez left the jury with the false impression that appellant had never admitted to any involve-

---

13. *See Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (magistrate's determination of whether affidavit reflects a "substantial basis" for concluding that a search would uncover evidence of a crime entitled to great deference); *Swearingen v. State,* 143 S.W.3d 808, 811 (Tex.Cr.App.2004) (magistrate's probable cause determination subject to deferential standard of appellate review).

ment in the victim's murder and that he had never expressed any regret or compassion over the victim's death. We agree with the State, however, that it left no false impressions because it did not elicit any testimony from Martinez about whether appellant "admitted guilt or was remorseful or not." *See Allridge v. State,* 762 S.W.2d 146, 152–53 (Tex.Cr.App.1988) (defendant's self-serving statements not admissible under rule of "completeness" where State did not mislead jury or leave jury with a partial or incomplete version of the facts). That appellant may have left a false impression about whether he admitted to any involvement in the offense through his cross-examination of Martinez did not make his December 3rd written statement admissible. *See Allridge,* 762 S.W.2d at 152 (accused's self-serving declarations ordinarily inadmissible unless they are "part of the statement or conversation previously proved by the State, or being necessary to explain or contradict acts or declarations first offered by the State") (internal quotes omitted). Appellant's fifth point of error is overruled.

In point of error number nine, appellant claims that the trial court abused its discretion at the guilt phase of trial by allowing the State to present victim-impact evidence by the victim's mother, who testified about where the victim went to school, what type of student she was, and what she liked to do. The record from the guilt phase reflects that the State elicited this testimony from the victim's mother after she identified the vest that the victim was wearing when she was murdered.

Q. [STATE]: And when you went to the Wal–Mart that day, what was [the victim] wearing?

A. [VICTIM'S MOTHER]: Her red dress, white socks and black shoes.

Q. I'm showing you, [victim's mother], what's been marked as State's Exhibit

78. Could you take it out of the plastic bag which holds State's Exhibit 78 and take a look at it for me?

(Brief pause—witness crying)

[STATE]: Can we have a moment, Your Honor?

[THE COURT]: Yes.

Q. Can—can you identify it?

A. Yes.

Q. What is it?

A. This is [the victim's] vest.

[STATE]: Your Honor, at this time I'd offer State's 78 into evidence after showing it to counsel.

[DEFENSE]: No objection.

[THE COURT]: So admitted.

(State's Exhibit No. 78 was admitted)

Q. Would you like a break or can you continue?

A. I can continue.

Q. Can you tell us what kind of child [the victim] was?

A. She was a very loving child.

Q. And could you tell us a few of her favorite things?

[DEFENSE]: Your Honor, we would object to relevance.

[THE COURT]: Sustained.

[STATE]: May I respond, Your Honor?

[THE COURT]: You may.

[STATE]: Your Honor, I don't have very many questions in this area, but I do believe the State is entitled to question about the victim, but I'm not going to dwell on this area. I could tell the Court the questions that I have that I would ask.

[THE COURT]: All right. Tell me what they are.

[STATE]: Can I ask her a few of her favorite things, what school she attended, what grade she was in and what kind of student she was like? That's it.

[DEFENSE]: Your Honor, I move that's victim impact evidence.

[THE COURT]: I'll overrule it. I'll allow you to ask those questions.

(Translating prior question)

A. She liked to play on the monkey bars a lot.

Q. What school did she attend?

A. Lorenzo Loya.

Q. And what grade was she in?

A. Prekinder.

Q. And can you tell us what kind of student she was in prekinder?

A. She was an excellent child.

In *Mosley v. State,* we stated that victim-impact evidence is "generally recognized as evidence concerning the effect the victim's death will have on others, particularly the victim's family members." *Mosley v. State,* 983 S.W.2d 249, 261 (Tex.Cr. App.1998). Appellant mischaracterizes the mother's testimony as victim-impact evidence because her testimony did not concern how the murder affected her or her family's life. Appellant's victim-impact objection was not a proper objection. The trial court, therefore, did not abuse its discretion in overruling appellant's objection to the mother's testimony on those grounds.

■ We also note that the mother's testimony was not offered for a constitutionally improper purpose such as to invite the jury to find that appellant is more deserving of punishment by comparing the victim's worth to other members of society. *See Mosley,* 983 S.W.2d at 261–64. On this record, any non-constitutional error in admitting the mother's testimony at the guilt phase had little, if any, effect on the jury's verdict at the this phase,[14] and the jury could have properly considered this evidence at the punishment phase for the purpose that it was admitted. *See Mosley,* 983 S.W.2d at 261–64. Appellant's ninth point of error is overruled.

In points of error ten and eleven, appellant contends that the trial court's failure to define the term "probability" in the punishment charge, which is used in the first special issue, violated his federal and state Constitutional rights to due process and to be free of cruel and unusual punishment, and that the failure to define the term rendered the first special issue unconstitutionally vague. *See* CODE OF CRIM. PROC. art. 37.071, § 2(b)(1). This Court has repeatedly held that the trial court need not define this term because the jury is presumed to understand it without further instruction. *Feldman v. State,* 71 S.W.3d 738, 757 (Tex.Cr.App.2002); *Ladd v. State,* 3 S.W.3d 547, 572–73 (Tex.Cr. App.1999). Appellant has given us no reason to revisit these holdings. Points of error ten and eleven are overruled.

■ In point of error twelve, appellant asserts that the legislative modifications to Article 37.071, TEX.CODE CRIM. PROC., after the Supreme Court's decision in *Jurek v. Texas,*[15] have made this statute unconstitutional. Appellant claims that our Legislature has so broadened the categories of murders eligible for the death penalty that the Texas death-penalty law no longer passes constitutional muster. Specifically, appellant contends that TEX. PEN.CODE, § 19.03(a)(8), is unconstitutional for making an individual who "knowingly" murders

---

14. *See* TEX.R.APP. PROC. 44.2(b); *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Cr.App.1998) (criminal conviction should not be overturned for non-constitutional error if appellate court has fair assurance that the error did not influence the jury, or had but a slight effect).

15. 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

a child under age six eligible for the death penalty.

We do not agree that our Legislature is constitutionally prohibited from making it a death-penalty offense for someone to "knowingly" murder a child under age six. *See Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result"); *Jurek v. Texas,* 428 U.S. 262, 268, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding Texas' death-penalty statute limiting homicides to, among other things, "intentional and knowing murders"); *Henderson v. State,* 962 S.W.2d 544, 563 (Tex.Cr.App.1998). Point of error twelve is overruled.

In point of error thirteen, appellant asserts that article 37.071 is unconstitutional because this Court no longer affords meaningful appellate review. Specifically, appellant contends that this Court does not allow factual sufficiency review of the future-dangerousness issue, any sufficiency review of the mitigation issue, or a comparative-proportionality review of similarly situated defendants. This Court has held that only a review of the legal sufficiency of the evidence under *Jackson* is feasible in reviewing sufficiency of the evidence of future dangerousness, and a factual-sufficiency review is not constitutionally required. *McGinn v. State,* 961 S.W.2d 161 (Tex.Cr.App.1998). This Court has also held that appellate review of the mitigation issue is not constitutionally required. *Ladd,* 3 S.W.3d at 573; *McFarland v. State,* 928 S.W.2d 482, 499 (Tex.Cr.App. 1996). Further, comparative proportional-

ity review is not constitutionally required. *King v. State,* 953 S.W.2d 266, 273 (Tex.Cr. App.1997). Thus, appellant's thirteenth point of error is overruled.

 In appellant's fourteenth point of error, he contends that the order in which the special questions were submitted (future dangerousness before mitigation) violates due process by precluding any meaningful consideration of mitigating evidence. But, the instructions require the jury to consider all the evidence, and we presume that the jury follows these instructions. *See Colburn v. State,* 966 S.W.2d 511, 520 (Tex.Cr.App.1998). Appellant's fourteenth point of error is overruled.

In appellant's fifteenth point of error, appellant asserts that the failure to assign the burden of proof on the mitigation issue violates Due Process and the Eighth Amendment. We have resolved this claim adversely to appellant. *Ladd,* 3 S.W.3d at 573. Appellant's fifteenth point of error is overruled.

Appellant argues in his sixteenth point of error, that the limitation on mitigation in the second special issue submitted to the jury: that the mitigation should only apply to "the personal moral culpability of the defendant" and "blameworthiness," violates the Eighth and Fourteenth Amendments. We have addressed and rejected such arguments before, and appellant has given us no reason to revisit the issue here. *Ladd,* 3 S.W.3d at 573–74; *King,* 953 S.W.2d at 274. Point of error sixteen is overruled.

 Appellant argues in his seventeenth point of error that the trial court erred during the guilt phase in not instructing the jury that a "contamination sheet" which was "mutilated or destroyed by a party would indicate to the party-to the Jury that they should hold their-any inferences drawn from that should be neg-

ative to the party having the evidence and who has destroyed it." Evidence was presented that the police generated a document called a "contamination sheet" at the scene where the victim's body was found on November 19th. This location was an alley under a car port behind a medical office. The contamination sheet records who is at the crime scene and who goes into what is called the "red zone" which is the most inner circle of the actual scene. The main purpose of the contamination sheet is to preserve the integrity of the evidence collected at the crime scene.

The record reflects that Martinez and Pantoja were at the crime scene where the victim's body was found. Appellant theorized that they somehow could have transferred the victim's blood from the crime scene on November 19th to appellant's van when they briefly searched it on November 20th. Martinez and Pantoja both testified that they never entered the red zone. Some question was raised at trial as to the location of the original contamination sheet because the State produced a typewritten supplement when a contamination sheet is usually a handwritten document.

Martinez testified that he had never seen a contamination sheet that was not handwritten. When defense counsel showed him a typewritten supplement represented by the State to be the contamination sheet, Martinez stated that he had not seen one like that, but could not state whether that was the original contamination sheet or not.

[DEFENSE]: Are contamination sheets on supplemental reports, the originals, kept by patrol officers?

[MARTINEZ]: I have not seen one other than that.

[DEFENSE]: You've not see one on a supplemental sheet, have you?

[MARTINEZ]: I have not.

[DEFENSE]: So we know this is not the original, don't we?

[MARTINEZ]: I couldn't answer that question because I haven't seen another one, but unless this is it.

[DEFENSE]: Detective, can you answer the question. Is that an original one? Do you really think that's an original?

[MARTINEZ]: You have to ask the officer, sir, I don't know.

Though the evidence might support a finding that the original contamination sheet was missing, there is no evidence in this record to support a finding that the police destroyed or mutilated it. The trial court, therefore, did not err in refusing appellant's requested jury instruction. Point of error seventeen is overruled.

 In his eighteenth point of error, appellant claims that the evidence is legally insufficient to support the jury's verdict on the issue of future dangerousness. We view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Appellant argues that there is no evidence that the murder was calculated or the product of forethought or deliberateness and appellant's prior criminal record does not involve violence or the intent to harm anyone. The evidence that appellant abducted and brutally a murdered a five-year-old girl while on probation for indecency with an eight-year-old girl, and his three DWIs, his failure to perform well on probation, and the expert testimony that he was dangerous are sufficient to support a rational finding that "there is a probability that [appellant] would commit criminal

acts of violence that would constitute a continuing threat to society." *See* Article 37.071, § 2(b)(1), Tex.Code Crim. Proc. Appellant's eighteenth point of error is overruled.

▆▆▆▆ In his nineteenth point of error, appellant argues that the trial court erred in not granting the motion to change venue. The test applied in determining whether a trial court should grant a motion to change venue is whether the outside influences affecting the community climate of opinion as to a defendant are inherently suspect. *DeBlanc v. State,* 799 S.W.2d 701, 704 (Tex.Cr.App.1990). The defendant seeking a change of venue bears a heavy burden to prove the existence of such prejudice in the community, that the likelihood of obtaining a fair and impartial trial jury is doubtful. *Id.* Merely because a particular case is publicized in the media does not give rise to an automatic showing of prejudice such that the defendant is entitled to a venue change; jurors do not have to be totally ignorant of the effects and issues of a particular case. *Id.* Rather, for a defendant to prevail in his motion to change venue, he must demonstrate that publicity about the case is pervasive, prejudicial and inflammatory; that is, a defendant must demonstrate an "actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come." *Id.* On appeal, the standard of review for this Court is whether the trial court abused its discretion in refusing to grant the change of venue. *Id.* at 705.

The introduction of the various witnesses' testimony at the hearing on the motion to change venue presented a factual dispute for the trial court to resolve-whether appellant could receive a fair trial in El Paso County. The trial court found,

and the record adequately supports the finding, that appellant could receive a fair trial. All the witnesses who testified at the hearing, except the defense attorneys, stated that appellant could receive a fair trial in El Paso County. We hold that the trial court did not abuse its discretion in this case when it denied appellant's motion for a change of venue. Appellant's nineteenth point of error is overruled.

In appellant's twentieth point of error, he argues that the trial court erred in not quashing the "death notice," as the notice was not returned by a grand jury as part of the indictment as required by the Texas and United States Constitutions. After the grand jury returned its indictment against appellant, the State filed its Notice of Intention to Seek Death. In response, appellant filed a motion to quash the State's notice, alleging that the grand jury had not included the future-dangerousness issue in the indictment and therefore, the State's notice was improper. After a hearing on the motion to quash, the trial court denied the motion.

Appellant claims that the Supreme Court's decisions in *Ring* and *Apprendi*[16] require that the grand jury allege the aggravating factor of future dangerousness in the indictment before the State can seek the death penalty. However, this Court has held that *Apprendi* does not require the State to allege the special issues in the indictment, nor is such requirement present in *Ring. See Russeau v. State,* 171 S.W.3d 871, 886 (Tex.Cr.App.2005), *cert denied,* —— U.S. ——, 126 S.Ct. 2982, 165 L.Ed.2d 989 (2006); *Rayford v. State,* 125 S.W.3d 521, 533 (Tex.Cr.App.2003), *cert. denied,* 543 U.S. 823, 125 S.Ct. 39, 160 L.Ed.2d 35 (2004). Point of error twenty is overruled.

---

**16.** *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v.*

*New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

We find it unnecessary to address appellant's remaining punishment points of error (points seven, eight, twenty-one and twenty-two). The judgment of guilt is affirmed. The judgment assessing the death penalty is reversed, and the case is remanded to the trial court for a new punishment hearing. *See* Article 44.29(c), TEX. CODE CRIM. PROC.

KELLER, P.J., filed a dissenting opinion.

MEYERS, J., dissented.

KELLER, P.J., dissenting.

The Court reverses appellant's death sentence on the basis that the trial court erred in excluding evidence of remorse. I cannot agree. First of all, appellant's out-of-court statement was not an expression of remorse; it was an attempt to deflect blame. Appellant never expressed sorrow for his conduct. Instead, he attempted to cast himself as an innocent victim who was coerced into assisting the perpetrators. He did not say he was sorry even for the limited conduct that he admitted to. Even viewing the evidence in the light most favorable to the defendant, I do not believe that a rational trier of fact would have taken this statement to be an expression of remorse. Therefore, it was not relevant to appellant's defense on the special issues and was, in fact, inadmissible hearsay.

Second, as to harm, even if appellant's statement were considered to be an expression of remorse, it would constitute one of the weakest, most pitiful expressions of remorse I have ever seen. Appellant's so-called expression of remorse would have raised, for the first time at punishment, the possibility that others participated in the offense, but there was no evidence at trial that anyone else was involved in the murder. Given that the statement contradicted the evidence at tri-al, the jury had no reason to believe it. And given appellant's prior history as a child molester and the circumstances of the offense, i.e., the brutal murder of a five-year-old-girl, I also conclude, beyond a reasonable doubt, that the exclusion of the evidence did not contribute to the jury's answers to the punishment issues.

Third, appellant's statement would, in fact, have handed the prosecutor a powerful jury argument: that appellant had in his statement done the exact *opposite* of expressing remorse by affirmatively attempting to deflect responsibility for his own conduct.

I respectfully dissent.