COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-356-CR

 

 

EDWARD VANEGAS                                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

Introduction








Appellant Edward Vanegas appeals his first-degree
felony convictions for two counts of possession of a controlled substance with
the intent to deliver.  See Tex.
Health & Safety Code Ann. ' 481.112(a),
(d) (Vernon Supp. 2009).  In four issues,
he contends that the evidence is legally and factually insufficient to support
his convictions, that the trial court abused its discretion by refusing his
request for additional time to retain trial counsel of his choice, and that the
trial court abused its discretion by admitting the testimony of a Child
Protective Services (CPS) investigator. 
We affirm.

Background Facts

Terry Dart and his son, Clint, are notable drug
dealers in Denton County.  Terry and
Clint both have significant criminal histories.

In January 2008, the Denton County Sheriff=s Office
(DCSO) executed a search warrant at Terry=s house,
found cocaine, and arrested Terry. 
Clint arrived at the scene, and he eventually told the police that
in exchange for their leniency on Terry and for their assistance through a
recommendation to the prosecutors on his own pending drug case, he would help
them set up Terry=s drug distributor, Vanegas, for
a drug bust.  DCSO Officer Shane Norie, a
narcotics investigator, testified that he never submitted Terry=s case
for prosecution but that if the case had been submitted, Terry could have
received up to a life sentence.  Clint
also agreed to help officers make cases against two or three other individuals.








Clint met Officer Norie at a Wal-Mart on the
afternoon of February 8, 2008.  Officer
Norie searched Clint and Clint=s pickup
when Clint arrived to ensure that Clint did not bring any drugs to the
Wal-Mart.  Clint and Officer Norie went
inside the Wal-Mart and sat together in the Wal-Mart=s
McDonald=s
restaurant. 

Several other police officers, including DCSO
Sergeant Jeff Davis, also arrived at the Wal-Mart at around 2 p.m. and remained
in the parking lot to act as a surveillance and arrest team.  Clint placed a short telephone call to
Vanegas; a digital device recorded the call.

The recording begins with Officer Norie
explaining the purpose of Clint=s call
to Vanegas as Aan attempt to arrange for the
quantity of cocaine and the quantity of methamphetamine.@  The call then begins by Clint telling
Vanegas, AI went and got my check cashed,
and I got my money.@ 
Later in the call, Clint told Vanegas where he was and that he wanted Aa half
onion[[2]]
of meth and give me an ounce of coke tooCI=ve got
twenty-five hundred on me.@  Vanegas responded, AI
probably only have like a quarter on me.@  Clint said, AI=ll take
whatever you can get.@ 
Vanegas said, AOkay,@ and
then he told Clint that he would arrive at the Wal-Mart in thirty to forty-five
minutes.  Clint told Vanegas, AWhen you
call, I=ll just
come out and jump in your car.@  Vanegas said, AAllright,
cool.@













Clint stayed with Officer Norie in the McDonald=s
restaurant until Vanegas arrived at the Wal-Mart at around 4 p.m.  Vanegas called Clint, and Clint left the
Wal-Mart store and walked through the parking lot about thirty yards toward
Vanegas=s car
without Officer Norie.[3]  Vanegas got out of his vehicle, and he and
Clint had a brief conversation.  They
walked over to the driver=s side of Clint=s
pickup, and Clint opened the door. 
Sergeant Davis drove his car up to the bumper of Clint=s
pickup, got out of the car, identified himself, and told Vanegas to show his
hands.  Vanegas looked at Sergeant Davis,
looked away from Sergeant Davis, and then Areache[d]
with a closed [left] hand inside the vehicle and immediately [brought] his hand
back out.@ 
Sergeant Davis then took control of Vanegas, who did not resist; while
Sergeant Davis was doing so, he saw two baggies containing drugs in Clint=s
pickup.  One baggie contained
approximately seven grams of methamphetamine, and the other baggie contained
approximately fifteen grams of cocaine.[4]

The officers did not find any weapons on Vanegas
or in his car.  They spoke to the
people in Vanegas=s car, and they noticed a child
in the car.

Danny Roberts, a CPS investigator, spoke with Vanegas
around 6 p.m. on the night of his arrest. 
For safety purposes, a police officer accompanied Roberts during his
interview with Vanegas.  Roberts
expressed his understanding that Vanegas had been arrested for selling drugs,
and Vanegas told Roberts that Ahe had
picked up his son from [Vanegas=s]
mother . . .[,] [a]nd then he went to Wal-Mart to do the delivery with his son
present.@[5]

In May 2008, a Denton County grand jury indicted
Vanegas for two counts of possession of a controlled substance with the intent
to deliver.  Count one of the indictment
concerned Vanegas=s intent to deliver
methamphetamine of an amount between four and two hundred grams, and count two
regarded his intent to deliver cocaine of that same amount.








Vanegas pled not guilty before a jury in October
2008.  After the State presented its
evidence, the parties rested and submitted closing arguments.  The jury found Vanegas guilty of the charges
contained in both counts of the indictment. 
After the parties presented evidence regarding Vanegas=s
punishment, the jury assessed thirty years=
confinement on each count.  Vanegas filed
notice of this appeal.

Evidentiary Sufficiency








In his first two issues, Vanegas asserts that the
evidence is legally and factually insufficient to support his conviction for
possession with intent to deliver methamphetamine and cocaine.  In a possession-with-intent-to-deliver case,
the State must prove through direct or circumstantial evidence that the
defendant (1) exercised care, custody, control, or management over the
controlled substance, (2) intended to deliver the controlled substance to another,
and (3) knew that the substance in his possession was a controlled
substance.  Poindexter v. State,
153 S.W.3d 402, 405B06 (Tex. Crim. App. 2005);
Nhem v. State, 129 S.W.3d 696, 699 (Tex. App.CHouston
[1st Dist.] 2004, no pet.); see Tex. Health & Safety Code Ann. '
481.002(38) (Vernon Supp. 2009), ' 481.112(a).  Vanegas contends that the evidence is insufficient
to support his conviction because it allegedly fails to establish that he
knowingly possessed the drugs by having 
custody or control of them or that he intended to deliver them.

Standards of review

Legal sufficiency

In reviewing the legal sufficiency of the
evidence to support a conviction, we view all of the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007). 
This standard gives full play to the responsibility of the trier of fact
to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Clayton, 235 S.W.3d at 778.








The trier of fact is the sole judge of the weight
and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State,
270 S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct.
2075 (2009).  Thus, when performing a
legal sufficiency review, we may not re-evaluate the weight and credibility of
the evidence and substitute our judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778. The
standard of review is the same for direct and circumstantial evidence cases;
circumstantial evidence is as probative as direct evidence in establishing the
guilt of an actor.  Clayton, 235
S.W.3d at 778; Hooper, 214 S.W.3d at 13.

Factual sufficiency








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Neal v. State,
256 S.W.3d 264, 275 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct.
1037 (2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App.
2006).  We then ask whether the evidence
supporting the conviction, although legally sufficient, is nevertheless so weak
that the factfinder=s determination is clearly wrong
and manifestly unjust or whether conflicting evidence so greatly outweighs the
evidence supporting the conviction that the factfinder=s
determination is manifestly unjust.  Lancon
v. State, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204
S.W.3d at 414B15, 417.  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, although legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.

In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson v. State, 23 S.W.3d 1, 12
(Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997).

Analysis








AWhen the accused is not in exclusive
possession of the place where [drugs are] found, it cannot be concluded that
the accused had knowledge of and control over the contraband unless there are
additional independent facts and circumstances which affirmatively link the
accused to the contraband.@  Deshong v. State, 625 S.W.2d 327, 329
(Tex. Crim. App. [Panel Op.] 1981).  The Aaffirmative
links@
analysis requires direct or circumstantial evidence that the defendant=s
connection with the drugs was Amore
than just fortuitous.@ 
Brown v. State, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); see
Poindexter, 153 S.W.3d at 406.

Vanegas was not in exclusive possession of Clint=s
pickup, so we must determine whether there are sufficient links from Vanegas to
the drugs.  He asserts that the
links are Aessentially absent@ because
the Aonly
factors tending to link [him] to the [drugs] consist of his nearby presence@ when
they were found.








But this is not a case, like the case relied on
for comparison in Vanegas=s brief, in which the only
essential connection of a defendant to drugs was the defendant=s
physical proximity to them.  See Molina
v. State, Nos. 205‑03, 206‑03, 2003 WL 22250391, at *1B4 (Tex.
Crim. App. Oct. 1, 2003) (not designated for publication).  Instead, Vanegas was not only present when
the drugs were found, but also (1) the drugs were in plain view in an area
(Clint=s truck)
that Vanegas was very close to; (2) Vanegas made incriminating statements to
Roberts, the CPS investigator, following his arrest; and (3) Vanegas=s
conduct of reaching in the pickup with his closed hand and then immediately
bringing his hand back out after Sergeant Davis told him to put his hands up
indicated Vanegas=s consciousness of guilt.  See Tucker v. State, 183 S.W.3d 501,
510 (Tex. App.CFort Worth 2005, no pet.)
(listing factors relevant to an affirmative links analysis).[6]

More importantly, the jury heard the recording of
Vanegas agreeing to transfer to Clint the same drugsCcocaine
and methamphetamineCthat the officers found in Clint=s
pickup, and Clint could not have placed the drugs there because he and his
pickup were searched upon his arrival at Wal-Mart.  Vanegas apparently asks us conclude that
following Clint=s call to him specifically
requesting drugs, his appearance at the same Wal-Mart described in the call on
the same day as the call still cannot link to him to the custody or control of
the same drugs requested in the call.  We decline
to make that conclusion, and the evidence does not indicate any alternate way
that the drugs could have appeared in Clint=s
pickup.  








Next, Vanegas cites a six-factor test that
relates to when intent to deliver may be proved by circumstantial
evidence.  See Garrett v. State,
161 S.W.3d 664, 671 (Tex. App.CFort
Worth 2005, pet. ref=d); Jordan v. State, 139
S.W.3d 723, 726 (Tex. App.CFort
Worth 2004, no pet.).  But here, Vanegas=s
conversation with Clint and his admission to Roberts directly establish his
intent.  Also, Sergeant Davis testified
that the amount of drugs he found in Clint=s pickup
is large enough to indicate an intent to distribute.  He explained that just one gram of
methamphetamine costs around $100 and that seven grams costs between $350 and
$450.  He stated that fifteen grams of
cocaine costs between $400 and $600. 
Finally, the cocaine that the officers found was in Abrick@ form,
which means that it could have been Abroken off
a kilogram@ for further distribution.

We hold that a jury could rationally find that
Vanegas intended to distribute cocaine and methamphetamine to Clint.  Thus, we overrule Vanegas=s legal
sufficiency challenge in his first issue. 
See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. 








In Vanegas=s second
issue, regarding factual sufficiency, he theorizes that someone may have placed
cocaine and methamphetamine in Clint=s truck
from the time it was initially searched by Officer Norie to the time the drugs
were found in the truck upon his arrival at the Wal-Mart.  He argues that the evidence Aplausibly
suggested that Clint Dart arranged for the drugs to be placed in his truck in
the two hours before [Vanegas] arrived on the scene.@  But testimony indicated that several officers
watched the Wal-Mart parking lot from the time Clint arrived there, at
approximately 2 p.m.,[7]
until the time Vanegas arrived, at around 4 p.m.

Based on Vanegas=s
statements in the phone recording and to Roberts,  his compliance with the intention he
expressed in the recording, and the remaining facts and circumstances detailed
above, we hold that the evidence is not so weak that the jury=s
decision to convict him was clearly wrong and manifestly unjust.  See Lancon, 253 S.W.3d at 704.  Thus, the evidence is factually sufficient to
support Vanegas=s convictions, and we overrule
his second issue.

Vanegas=s
Request for Different Counsel

At the beginning of the trial on October 6, 2008,
the following exchange occurred between the trial judge and Vanegas:

THE DEFENDANT:  I would like to
ask for a little more time to retain a lawyer. 
I mean, what I=m saying is I don=t wish to proceed with
this ‑‑ with this trial with Mr. Adame.

 








THE COURT:  Okay.  Well, Mr. Vanegas, you applied for a court‑appointed
attorney, you asked for a court‑appointed attorney, you got a court‑appointed
attorney.  And you can=t wait until the day of
trial and thereby manipulate the system and postpone your case to come in and
say that you want a different attorney. 
If you had a different attorney that you hired here today and ready to
go, then we would ‑‑ then that would be certainly your choice, and
we would proceed with that attorney.  But
I=m not going to postpone
this case.

 

THE DEFENDANT:  Okay.

 

THE COURT:  Mr. Adame is more
than capable of representing you in this case, and you just need to cooperate
with him, because, you know, this affects you more than anybody.

 

THE DEFENDANT:  Okay.  I was set for another ‑‑ for a
court date on the 26th, I believe.  And I
was never called out for it.  And, I
mean, Wednesday, you know, he comes to see me and tells me I have a trial
Monday.  So . . .

 

THE COURT:  Okay.  Well, you signed off on a pass slip back on
July the 3rd.  Well ‑‑

 

. . . .

 

THE DEFENDANT:  No, I was not
told the specific date.  He told me
in October but not on this specific date.

 

THE COURT:  Okay.

 

THE DEFENDANT:  Until last week.

 

THE COURT:  Well, you don=t have another attorney
here to represent you.  Is that correct?

 

THE DEFENDANT:  Not today, ma=am.

 

THE COURT:  Okay.  And, well, we=re going to proceed with
Mr. Adame, so I just ‑‑ like I said before, I suggest that you
confer with him and help him in your defense in this case, because we=re about to seat a jury
and we=re about to proceed with
this trial.  We can=t postpone it on the day
of trial. 

 








Vanegas contends in his third issue that the
trial court abused its discretion and violated his constitutional rights by
refusing his request for additional time to retain trial counsel of his
choice.  He equates his third issue to a
challenge of a denial of a motion for a continuance.

Standard of review and applicable law

The denial of a motion for continuance is within
the sound discretion of the trial court, and our review of the denial of the
motion is limited to whether the trial court abused that discretion.  Renteria v. State, 206 S.W.3d 689, 699
(Tex. Crim. App. 2006); Janecka v. State, 937 S.W.2d 456, 468 (Tex.
Crim. App. 1996), cert. denied, 522 U.S. 825 (1997); Williams v.
State, 172 S.W.3d 730, 733 (Tex. App.CFort
Worth 2005, pet. ref=d).  A defendant must show Aspecific
prejudice to his defense@ to establish that the trial
court abused its discretion by refusing to grant a continuance.  Renteria, 206 S.W.3d at 699; Janecka,
937 S.W.2d at 468.  Examples of specific
prejudice include unfair surprise, an inability to effectively cross‑examine
witnesses, and the inability to elicit crucial testimony from potential
witnesses.  Janecka, 937 S.W.2d at
468.








The federal and Texas constitutions guarantee the
right to counsel in criminal cases and contemplate the right to obtain paid,
nonappointed counsel of the defendant=s
choosing.  United States v. Gonzalez‑Lopez,
548 U.S. 140, 151B52, 126 S. Ct. 2557, 2565B66
(2006); Gonzalez v. State, 117 S.W.3d 831, 836B37 (Tex.
Crim. App. 2003).  But the right to
counsel of the defendant=s choosing is not absolute, and
Texas courts have consistently noted that a defendant cannot wait until the day
of trial to demand different counsel or to request that counsel be dismissed so
that he may retain other counsel.  Gonzalez,
117 S.W.3d at 837; Webb v. State, 533 S.W.2d 780, 784 (Tex. Crim. App.
1976) (explaining that an Aaccused=s right
to represent himself or select his own counsel cannot be manipulated so as to
obstruct the orderly procedure in the courts or to interfere with the fair
administration of justice@).








In deciding whether to grant a continuance
because of the absence of the defendant=s choice
of counsel, the trial court should weigh the following factors:  (1) the length of delay requested; (2)
whether other continuances were requested and whether they were denied or
granted; (3) the length of time in which the accused=s
counsel had to prepare for trial; (4) whether another competent attorney was
prepared to try the case; (5) the balanced convenience or inconvenience to the
witnesses, the opposing counsel, and the trial court; (6) whether the
delay was for legitimate or contrived reasons; (7) whether the case was complex
or simple; (8) whether the denial of the motion resulted in some identifiable
harm to the defendant; and (9) the quality of legal representation actually
provided.  Ex parte Windham, 634
S.W.2d 718, 720 (Tex. Crim. App. 1982). 
We must determine whether the trial court could reasonably have balanced
these factors and concluded that the fair and efficient administration of
justice weighed more heavily than Vanegas=s right
to counsel of his choice.  See Greene
v. State, 124 S.W.3d 789, 794 (Tex. App.CHouston
[1st Dist.] 2003, pet. ref=d).

Analysis








Here, Vanegas had from May 2008, when he was
indicted, until October 2008, the time of his trial, to retain counsel.  But in those six months, he failed to do
so.  And although he knew in July that
his trial would begin in October, he waited until the day of trial to request
more time to retain different counsel. 
Although no formal motions for continuance were filed, the record
contains ACOURT SETTING@
documents indicating that Vanegas=s case
was passed three times.  Vanegas=s
appointed counsel, Derek Adame, represented Vanegas at least since June 2008,
so he had at least five months to prepare for trial.  Vanegas admitted that no other attorney was
ready to try the case, and the record does not indicate how long it would have
taken Vanegas to retain counsel. 
Finally, although Vanegas contends that his appointed counsel did not
promptly file certain motions, he has not raised any error connected to such
motions, he has not contended that his appointed counsel was ineffective, and
he has not identified any particular strategic decision or other act of his
appointed counsel that could have changed the result of his case.

For all of these reasons, we hold that the trial
court did not abuse its discretion by denying Vanegas=s motion
for continuance to secure counsel of his choice.  See Renteria, 206 S.W.3d at 699; Webb,
533 S.W.2d at 784.  Thus,
we overrule his third issue.

The Trial Court=s
Decision to Admit Roberts=s
Testimony

In his fourth issue, Vanegas contends that the
trial court abused its discretion by admitting Roberts=s (the
CPS investigator=s) testimony because Roberts did
not provide Vanegas with any Miranda warnings before questioning
him.  See Miranda v. Arizona, 384
U.S. 436, 478B79, 86 S. Ct. 1602, 1630 (1966).

Standard of review








We review for an abuse of discretion a trial
court=s
decision to admit testimony of a CPS worker when the defendant challenges the
testimony under Miranda.  See
Berry v. State, 233 S.W.3d 847, 856 (Tex. Crim. App. 2007); Wilkerson v.
State, 173 S.W.3d 521, 524 (Tex. Crim. App. 2005).  Under that standard, we must affirm the trial
court=s
decision to admit the testimony if the decision is within a zone of reasonable
disagreement.  See Berry, 233
S.W.3d at 858; Shuffield v. State, 189 S.W.3d 782, 793 (Tex. Crim.
App.), cert. denied, 549 U.S. 1056 (2006); Moore v. State, 233
S.W.3d 32, 40 (Tex. App.CHouston [1st Dist.] 2007, no
pet.).

Applicable law

The United States Constitution provides that no
person Ashall be
compelled in any criminal case to be a witness against himself.@  U.S. Const. amend. V.  As a corollary to that provision, the United
States Supreme Court held in Miranda that

when an individual is
taken into custody or otherwise deprived of his freedom by the authorities in
any significant way and is subjected to questioning, the privilege against self‑incrimination
is jeopardized.  Procedural safeguards
must be employed to protect the privilege and unless other fully effective
means are adopted to notify the person of his right of silence and to assure
that the exercise of the right will be scrupulously honored, the following
measures are required.  He must be warned
prior to any questioning that he has the right to remain silent, that anything
he says can be used against him in a court of law, that he has the right to the
presence of an attorney, and that if he cannot afford an attorney one will be
appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be
afforded to him throughout the interrogation. 
After such warnings have been given, and such opportunity afforded him,
the individual may knowingly and intelligently waive these rights and agree to
answer questions or make a statement. 
But unless and until such warnings and waiver are demonstrated by the
prosecution at trial, no evidence obtained as a result of interrogation can be
used against him.

 








Miranda, 384 U.S. at 478B79, 86
S. Ct. at 1630.  However, the Court
limited its holding to custodial interrogation by Alaw
enforcement officers.@ 
Id. at 444, 86 S. Ct. at 1612. 
And the cases at issue in Miranda each involved Aincommunicado
interrogation of individuals in a police‑dominated atmosphere.@  Id. at 445, 86 S. Ct. at 1612; see
also Cobb v. State, 85 S.W.3d 258, 263 (Tex. Crim. App. 2002) (explaining
that the Fifth Amendment and the Miranda decision guard Aagainst
coercive custodial questioning by police[,]@
therefore protecting defendants Afrom the
possibility of physical or psychological >third
degree=
procedures@) (emphasis added), cert.
denied, 537 U.S. 1195 (2003).

The court of criminal appeals has twice recently
considered the application of Miranda=s
requirements to CPS employees=
custodial interviews of defendants.  See
Berry, 233 S.W.3d at 854B56; Wilkerson,
173 S.W.3d at 523B33.  In Wilkerson, a CPS investigator had
interviewed a defendant about the removal of his three children from the
defendant=s home a day after he was
arrested for injury to a child by placing the child into scalding water and by
hitting another child with a belt.  Wilkerson,
173 S.W.3d at 523B24.  The investigator Aneeded
to discuss the children=s placement in a foster home
because there were no other parents or family members to care for them.@  Id. at 524.  At trial, the defendant objected to the
investigator=s testimony regarding the
defendant=s incriminating admissions to
the investigator, but the trial court denied the objection.  Id. at 525.








In reviewing this court=s decision
to reverse one of the defendant=s
convictions based on the trial court=s
decision to admit the testimony, the court of criminal appeals considered when
a CPS investigator becomes Aa police
surrogate for purposes of Miranda warnings when the person she
interviews is in custody.@ 
Id. at 526.  The court
explained,

Although state employment
clearly makes a person an Aagent of the State,@ that label does not, by
itself, make the person an Aagent of the State@ for the purpose of
defining Acustodial interrogation.@  Not all government workers must be familiar
with and ready to administer Miranda warnings . . . .  [W]hen Athe official has not been given police powers, Miranda
has been held inapplicable to questioning by school officials, welfare
investigators, medical personnel, prison counselors, and parole or probation
officers.

 

. . .
.

 

. . .  [CPS workers=] mission is to protect
the welfare and safety of children in the community.  Although this duty may at times entail the
investigation of child abuse claims, that alone does not transform CPS workers
into law enforcement officers or their agents. . . .  If the obligation to report suspected child
abuse by itself could convert a CPS worker into a law enforcement agent, then
every person who suspects child abuse could be called a Alaw enforcement agent@ in the Miranda
context.  This is clearly not the law,
and it was certainly not the purpose of the prophylactic Miranda
warnings.

 

Id. at 528B29
(citations and footnotes omitted). 
However, the court cautioned that in some circumstances, Miranda=s
requirements may apply to a CPS investigator=s
questioning:








[I]f the once‑parallel
paths of CPS and the police converge, and police and state agent are
investigating a criminal offense in tandem, Miranda warnings . . . may
be necessary.  At this point, a CPS
worker may be viewed as an agent of the police. 
The term Aagency@ denotes a consensual relationship which exists
between two persons or parties where one of them is acting for or on behalf of
the other.  The law does not, however,
presume an agency relationship.  The
person alleging such a relationship has the burden of proving it.[[8]]  But if a defendant does prove that a
particular personCwhether CPS caseworker,
teacher, preacher, probation officer, or mere family friendCis, in fact, working for
or on behalf of the police by interrogating a person in custody, that agent is
bound by all constitutional and statutory confession rules, including Miranda.

 








Id. at 529B30 (footnotes omitted and emphasis added).  The court instructed that in determining
whether a CPS investigator=s path is parallel to or converges with police
purposes, courts should consider the Aactions and perceptions of the parties
involved:  the police, the CPS caseworker
(or other potential agent of the police), and the defendant himself.@  Id. at 530.  The court expounded,            First,
courts should look for information about the relationship between the police
and the potential police agent.  Did the
police know the interviewer was going to speak with the defendant?  Did the police arrange the meeting?  Were the police present during the
interview?  Did they provide the
interviewer with the questions to ask? 
Did they give the interviewer implicit or explicit instructions to get
certain information from the defendant? 
Was there a Acalculated practice@ between the police and
the interviewer that was likely to evoke an incriminating response from
defendant during the interview?  And
finally, does the record show that the police were using the agent=s interview to accomplish
what they could not lawfully accomplish themselves?  In sum, was law enforcement attempting to use
the interviewer as its anointed agent?

 

Second, courts should examine the record concerning the interviewer=s actions and
perceptions:  What was the interviewer=s primary reason for
questioning the person?  Were the
questions aimed at gaining information and evidence for a criminal prosecution,
or were they related to some other goal? 
How did the interviewer become involved in the case?  Did the interviewer help Abuild a case@ that led to the person=s arrest, or was the
interviewer pursuing some other goal or performing some other duty?  At whose request did the interviewer question
the arrestee?  In sum, did the
interviewer believe that he was acting as an agent of law enforcement?

 

Finally, courts should examine
the record for evidence of the defendant=s
perceptions of the encounter.  When the
defendant was interviewed, did he believe that he was speaking with a law‑enforcement
agent, someone cloaked with the actual or apparent authority of the
police?  What gave him this
impression?  Alternatively, would a
reasonable person in defendant=s
position believe that the interviewer was an agent of law enforcement?

At bottom, the inquiry is:  Was
this custodial interview conducted (explicitly or implicitly) on behalf of the
police for the primary purpose of gathering evidence or statements to be used
in a later criminal proceeding against the interviewee? Put another way, is the
interviewer acting as an Ainstrumentality@ or Aconduit@ for the police or
prosecution?  Most simply:  is the interviewer Ain cahoots@ with the police?

 

Id. at 530B31 (footnotes omitted).

 








The record in Wilkerson did not
demonstrate any police involvement in the CPS investigation and did not show
any of Wilkerson=s perceptions of the
investigation, and the CPS investigator=s mere
communication with police after speaking with Wilkerson did not transform the
investigator into a law enforcement agent. 
Id. at 532B33.  Thus, the court held that the trial court did
not abuse its discretion by admitting the investigator=s
testimony, reversed our decision, and affirmed the trial court=s
judgment.  Id. at 533.

Two years later, in Berry, the court of
criminal appeals again addressed the admissibility under Miranda of a
defendant=s custodial statements made to a
CPS employee.  Berry, 233 S.W.3d
at 854B56.  The court relied on its Wilkerson opinion
to hold that because the record in Berry (1) did not reflect that the
CPS employee questioned Berry at law enforcement=s
request; (2) indicated that the employee talked to Berry for reasons
related to the removal of a child and the child=s
placement; and (3) contained testimony from the employee that she was Anot
there doing an investigation,@ the
trial court did not abuse its discretion by admitting the employee=s
testimony regarding Berry=s incriminating statements.  Id. at 855B56.  Intermediate appellate courts reviewing
factual circumstances like those in Wilkerson have held that similar
testimony is admissible.  See Moore,
233 S.W.3d at 38B43.








Analysis

Here, the trial court conducted a brief hearing
outside of the jury=s presence regarding the
admissibility of Roberts=s testimony.  Roberts said that he met with Vanegas on the
day of Vanegas=s arrest in the Denton County
Jail=s
arraignment room.  When asked why he went
to speak with Vanegas, Roberts answered, A[CPS]
had received a call from [the] Denton County Sheriff that Mr. Vanegas had been
arrested for selling, I think it was, methamphetamine and cocaine, and at the
time of the arrest his child was in the back seat of the car.@ 

Roberts said that according to protocol
established by a CPS handbook, he identified himself as an employee of CPS to
Vanegas, explained the reason for CPS=s
investigation (Vanegas=s bringing his child to the
Wal-Mart during the drug delivery and the child=s
placement), and explained the nature of the interview.  Roberts testified, AI
explained to [Vanegas] that there had been a call to CPS, that I was under the
impression that he had been arrested that day with a child present, and at that
point there was nobody to release the child to.@








An officer accompanied Roberts during his
interview with Vanegas; Roberts said that he Abelieve[d]
it was one of the investigative officers, but [he was] not sure.@  Roberts could not remember whether the
officer was in uniform, and Roberts said that the officer was there for the Aonly
reason@ of
ensuring Roberts=s safety; he explained, A[The
officer] stayed in the room because Mr. Vanegas was a prisoner at the time, so
he couldn=t leave me alone in that room.@ 

The officer stood across the arraignment room
from Vanegas and Roberts, and the officer did not communicate with Roberts
during the interview or involve himself at all in the interview.  When the State=s
prosecutor asked Roberts directly whether the officer involved Ahimself
in [Roberts=s] investigation with Mr.
Vanegas whatsoever,@ Roberts responded, ANot in
any way.@

Vanegas admitted to Roberts that he went to
Wal-Mart to make a delivery.  Roberts
testified that he interviewed Vanegas for Athe
safety of the child,@ not to help law enforcement,
because A[t]hat=s a
totally separate thing.@ He said he was not a part of
the police investigation and that his Aonly
interest [was] the child and the CPS investigation.@  Roberts talked with Vanegas about facts other
than those involving his drug delivery; for example, Roberts gathered Vanegas=s
background information.








At the end of Robert=s
testimony outside of the jury=s
presence, Vanegas urged a motion to suppress, arguing that although it was Aclear
that Mr. Roberts in the job he=s doing
is not a police officer,@ Roberts was Abasically
acting as an agent of the State@ to
circumvent Miranda.  Vanegas=s
counsel contended, 

If this person, the
arresting officer, was not present, if they had taken pains to make sure that
these two men were alone, then I don=t think I would have an argument there.  But the problem here is essentially the State
has been allowed to recruit this civilian to act as their agent to ask the
questions they would like to ask and get around [Miranda].

 

The trial court denied Vanegas=s motion
to suppress, stating that there was Ano
evidence . . . that this witness was recruited by the law enforcement agent or
that the law enforcement agent directed him in his conversation with [Vanegas].@

Vanegas relies heavily on the fact that an
officer was present during Roberts=s
interview, but the record contains no evidence that, as relevant under Wilkerson,
the officer arranged Robert=s
meeting with Vanegas, provided any questions to ask, gave any instructions, or
otherwise had any agreement or consent with Roberts at all regarding the
interview other than to provide safety. 
And although Vanegas did not testify regarding his perception of the
interview, we conclude that a reasonable person in his position, considering
Roberts=s
instructions to Vanegas, the officer=s lack
of participation in the interview, and the officer=s
positioning in the arraignment room, would not have believed that Roberts was
law enforcement=s agent.  Wilkerson, 173 S.W.3d at 530B31.








There is simply nothing in the record to indicate
that Roberts was Ain cahoots@ with
law enforcement, and Roberts=s testimony
affirmatively demonstrates otherwise. 
Therefore, we hold that the trial court did not abuse its discretion by
deciding to deny Vanegas=s motion to suppress and admit
Roberts=s
testimony because Vanegas has not satisfied his burden of proving any agency
relationship between Roberts and law enforcement=s
criminal investigation.  See Wilkerson,
173 S.W.3d at 524, 529.  We overrule
Vanegas=s final
issue.

Conclusion

Having overruled all of Vanegas=s
issues, we affirm the trial court=s
judgment.

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  October 8, 2009 











[1]See Tex. R. App. P. 47.4.





[2]AOnion@ is slang for an ounce;
half an onion is half an ounce, or around fourteen grams.





[3]Officer Norie remained
inside the Wal-Mart until the Adeal was done.@  Sergeant
Davis described the Abuy-bust@ plan as follows:

 

The way it was supposed to happen [was] Investigator Norie and Clint
Dart were supposed to be positioned inside the Wal‑Mart store.  When Edward Vanegas arrived at the location
and called and said [A]I=m here,[A] Clint Dart was going to
exit the Wal‑Mart, contact Edward Vanegas, confirm that the drug exhibits
were present, and at that time give a bust signal, which in this case I believe
was opening a toolbox in the back of his truck, which would give us a signal
that, okay, the dope is there and it=s time to move in.  We were going to block the vehicle from the
front and the back, as we usually do to prevent their escape, and effect the
arrest of the driver, Mr. Vanegas.





[4]A forensic scientist
later confirmed the character of the methamphetamine and cocaine and the
approximate weight of the substances (subtracting the weight of the baggies
themselves).





[5]The child that was with
Vanegas upon his arrest was not Vanegas=s biological son.





[6]Although our decision in Tucker
listed fourteen affirmative links factors, and Vanegas=s analysis focuses on
those factors, the factors are not independent tests of evidentiary
sufficiency, and they are not exclusive to the determination of whether
evidence sufficiently links a defendant to drugs.  Id.; see Evans v. State, 202
S.W.3d 158, 161 n.9 (Tex. Crim. App. 2006).





[7]Clint placed his call to
Vanegas at 2:05 p.m. inside the McDonald=s restaurant.





[8]The urging of a motion to
suppress does not thrust a burden on the State to show compliance with Miranda
warnings unless the defendant proves that the statements he wishes to
exclude were the product of custodial interrogation.  Id. at 532.