In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00104-CR**
_____

**JASON BRIAN HAMLIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 9th District Court
Montgomery County, Texas
Trial Cause No. 18-09-12843-CR

**MEMORANDUM OPINION**

A jury convicted appellant Jason Brian Hamlin of stalking as a habitual offender and assessed punishment at confinement for life. In two appellate issues, Hamlin challenges the sufficiency of the evidence and the admission of extraneous-offense evidence. We affirm the trial court's judgment.

THE EVIDENCE

On October 16, 2017, Deputy Steve Cranston of the Montgomery County Sheriff's Office responded to a 911 call regarding a possible trespass in progress at

1

a residence in The Woodlands. When Cranston arrived at the residence, the victim, N.H., was in the entryway of her home, and Cranston explained that she was "pretty hysterical[,]" "agitated[,]" and "fearful[.]" According to Cranston, Hamlin "seemed willing to get in his truck and leave." Cranston explained that a trespass warning was issued to Hamlin. A recording of N.H.'s 911 call was admitted into evidence and published to the jury. According to Cranston, a male voice could be heard shouting in the background of the 911 call, and he could also hear someone knocking on a door. Cranston testified that he believed N.H. might have taken drugs or been drinking, but she was articulate, and he could understand what had happened. Cranston explained that he had no doubt that N.H. did not want Hamlin at the residence.

Zach Maglisceau, a former night auditor at the Beachcomber Inn in Galveston, testified that an incident involving Hamlin and N.H. occurred at the Beachcomber Inn at approximately 2:00 a.m. on December 27, 2017. Maglisceau explained that N.H. ran up to the window in the lobby, pounded on it, and screamed, "Help me, call the police." According to Maglisceau, N.H. was only wearing a shirt and socks, and she seemed scared and had been crying. After Maglisceau let N.H. inside, N.H. was panicking, and she wanted Maglisceau to make sure the door was locked, and N.H. did not want to be visible from the window. Maglisceau testified that N.H. told him she had been held against her will, but she escaped and was afraid that Hamlin would

2

come after her. Maglisceau explained that he allowed N.H. to sit behind the counter and behind a door, and he called the police. Maglisceau described N.H. as "scared and panicky."

When the police arrived, they interviewed N.H. and Maglisceau, but they were unable to locate Hamlin. Maglisceau testified that he eventually put N.H. in a different room. According to Maglisceau, he received several calls throughout the night from a man who identified himself as Hamlin, and the caller said "if some girl showed up[,] she was a liar and not to believe . . . anything she said." Maglisceau testified that the caller threatened him and the hotel. Maglisceau transferred a call to N.H.'s room that turned out to be from Hamlin, and Maglisceau testified that N.H. called back "in a panic[,]" left the new room, and returned to the lobby, where she remained for the rest of the night. Maglisceau explained that he called the police again. According to Maglisceau, Hamlin made more than five threatening phone calls to the hotel, and Hamlin called fifteen to twenty times asking for N.H.

Steve Jensen, the manager and part owner of the Beachcomber Inn, testified that he saw N.H. asleep on two chairs when he arrived. Maglisceau informed him that N.H. had nowhere to go and no money, so Jensen decided to get a taxi to take N.H. to her home in The Woodlands. According to Maglisceau, by the time he spoke to investigators, the surveillance video recording of the incident was no longer available.

N.H.'s mother, J.H., testified that N.H. lives with her. J.H. explained that N.H. had been diagnosed as bipolar. According to J.H., N.H. began dating Hamlin in the fall of 2017. J.H. explained that in October 2017, N.H. called 911 to come to the residence, and when J.H. got home from work, N.H. was agitated, edgy, emotional, and fearful. N.H. told J.H. that she had hidden in a cupboard in the bathroom because N.H. thought Hamlin had broken into the house. According to J.H., around Christmas 2017, she learned that N.H. and Hamlin were going to Galveston. When N.H. returned on New Year's Eve, J.H. testified that N.H. had spoken to a women's shelter and was agitated, frantic, and "very frightened." J.H. testified that N.H. subsequently rang the doorbell and pounded on the door at 4:30 a.m., and when J.H. opened the door, N.H. was frantic, and N.H. told her that she had just jumped out of Hamlin's car. J.H. described N.H. as "pretty incoherent, frightened, crying, [and] banged up." J.H. explained that N.H. called 911.

According to J.H., after that incident, "nonstop" phone calls began coming to her residence, and the calls continued for many days, until J.H. turned off the answering machine and the ringers on the phones, and eventually took the phone off the hook. J.H. stated that Hamlin was the caller. According to J.H., Hamlin left "a lot of voicemails[,]" which J.H. characterized as "very disturbing[.]"J.H. testified that sometimes Hamlin called every two minutes. J.H. testified that when the calls were coming in, N.H. appeared to be very frightened and tormented, and she would

4

not come out of her room. According to J.H., N.H. appeared to be harassed, annoyed, tormented, and alarmed by the calls. J.H. explained that N.H. had talked about going to a women's shelter because she did not feel safe at home. J.H. testified that Hamlin "threatened to burn the house down." Recordings of the voicemail messages Hamlin left were admitted into evidence and published to the jury. J.H. explained that N.H. had used drugs before and during her relationship with Hamlin, and J.H. testified that she does not know where N.H. is.

Deputy Jacob Rodgers of the Montgomery County Sheriff's Office testified that he investigated the stalking allegation against Hamlin. Rodgers explained that the first event that he investigated was "a report of a family violence incident which took place at the victim's residence on October 8th of 2017." According to Rodgers, Hamlin was the suspect, and Hamlin had fled the scene when Rodgers arrived. Rodgers explained that N.H. was scared, shaken, and rattled, and she "expressed a lot of fear and anxiety whenever she spoke about [Hamlin]." Rodgers testified that because N.H. appeared to be rattled and fearful, he believed that "a physical disturbance had occurred that had not amounted to bodily injury[,]" so he continued to investigate until he found Hamlin at his residence. Hamlin admitted that a verbal disturbance had occurred, but he denied touching or assaulting N.H.

Rodgers testified that the next incident he investigated was a dispatch call regarding a criminal trespass or attempted burglary at the same residence on October

16, 2017. Rodgers explained that he, Deputy Cranston, and others responded to the 911 call. While investigating the second incident, Rodgers discovered that between 12:00 a.m. and 4:32 p.m. (when the victim called 911), 357 calls were made from Hamlin's phone to N.H.'s phone. The third incident Rodgers investigated was at the Beachcomber Inn in Galveston. Rodgers explained that he reviewed the investigating officers' records from the incident at the hotel and spoke with Maglisceau. In addition, Rodgers investigated an account of "family violence assault or vehicle disturbance[]" on January 21, 2018, about a mile from the victim's residence. According to Rodgers, Hamlin called the victim's phone 196 times on January 22, 2018; 145 times on January 24, 2018; and 235 times on January 25, 2018. Rodgers testified that his investigation confirmed his belief in the account N.H. provided. In addition, Rodgers reviewed voicemail messages left on the phone at the victim's residence, which were offered into evidence and published to the jury. Rodgers further testified that he investigated an alleged assault of the victim by Hamlin that occurred in the parking lot of Lowe's, and he took Hamlin into custody and interviewed him. Rodgers also explained that while Hamlin was in custody, he attempted "to solicit the assistance of his family members to . . . bother the victim[.]"

Hugo Saldana, the manager of Lowe's in Spring, Texas, explained that he saw a male and female in the parking lot, and he knew "something wasn't right." According to Saldana, the male jumped out, started holding the female tightly, and

they began walking toward the front of the store. Saldana explained that he contacted the store's loss prevention manager, Jay Davila. Davila testified that Saldana notified him that "there was a couple involved in an aggressive argument in the parking lot." Saldana later saw the female walking slowly through the store, and he testified that she had "a petrified look[,]" watery eyes, and she seemed "very, very frightened." Saldana explained that he approached her and asked if she needed help, and she told him that her boyfriend had threatened her with a knife. Saldana testified that the victim was crying, shaking, and "very distressed."

Harris County Deputy Constable Victor Taylor testified that he investigated a weapons disturbance involving Hamlin on January 26, 2018, in the parking lot of Lowe's. According to Taylor, N.H. looked emotional and scared, and she was crying. Taylor reviewed the video footage from Lowe's, which showed N.H., who was the passenger in Hamlin's vehicle, get out of Hamlin's vehicle and start walking toward the store's main entrance. Taylor explained that the video showed Hamlin's truck following N.H. as she walked toward the store, and then Hamlin parked his vehicle, got out, walked behind N.H., wrapped his arm around her, and started walking "in an aggressive manner."

Dr. Kathleen Latz testified that she holds a doctorate and a master's degree, and she teaches criminal justice courses, including victim studies courses. Latz explained that her dissertation research focused on domestic violence and stalking,

7

and she has "worked in the field of victim advocacy for a number of years[.]" According to Latz, repeated abuse "breaks a person over time[]" and might cause someone to self-medicate, and mental health issues can make it difficult for a person to leave an abusive relationship. Latz testified that victims sometimes return to their abusers or find that it is difficult to leave. Latz explained that domestic violence is "more than just physical[]" and is "usually not something that happens in isolation, but [it is] usually a pattern of behavior." According to Latz, abuse can also include intimidation, and she explained that when a victim tries to leave the relationship, the abuser's behavior tends to escalate, and the abuser might repeatedly attempt to contact the victim. Latz testified that the cycle of violence includes three stages: tension building, the acute battering incident, and the honeymoon phase. According to Latz, it is common for victims to continue to have contact with their abusers.

ISSUE ONE

In issue one, Hamlin argues that the evidence is insufficient because the State failed to prove all the elements of the stalking statute. Specifically, Hamlin asserts that the State failed to prove that Hamlin's repeated telephone calls harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended N.H. Hamlin emphasizes in his brief that N.H. was not called as a witness, there was "no indication" that N.H. reported Hamlin's calls to the authorities, and N.H. wanted to continue her relationship with Hamlin.

8

In evaluating the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). An appellate court may not sit as a thirteenth juror and substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *see also Brooks*, 323 S.W.3d at 899. A reviewing court must give full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the jury resolved such facts in favor of the verdict and defer to that resolution. *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. We treat direct and circumstantial evidence equally. *Id*.

Section 42.072(a)(1) of the Texas Penal Code provides that a person commits the offense of stalking if, on more than one occasion and pursuant to the same scheme or course of conduct directed at another person, the person knowingly engages in conduct that constitutes an offense under section 42.07 of the Penal Code. Tex. Penal Code Ann. § 42.072(a)(1). Section 42.07(a)(4) of the Texas Penal Code provides that a person commits the offense of harassment if he "causes the telephone of another to ring repeatedly or makes repeated telephone communications anonymously or in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another[.]" Tex. Penal Code Ann. § 42.07(a)(4). The indictment alleged, *inter alia*, that Hamlin caused the telephone of N.H. or J.H. "to ring repeatedly" on three occasions, making N.H. feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended and would have caused a reasonable person to feel harassed, annoyed, alarmed, tormented, embarrassed, or offended.

The jury heard evidence that before the phone calls occurred, N.H. had been agitated, edgy, emotional, and fearful, and had hidden in a cupboard because she believed Hamlin had broken into the house. The jury also heard evidence that before the phone calls, N.H. had spoken to a women's shelter and had jumped from Hamlin's car and arrived home frightened, crying, and "banged up." In addition, the jury heard evidence that Hamlin called the residence for several days, leading J.H. to turn off the answering machine and the ringers on the phones, and eventually take

10

the phone off the hook. The jury heard J.H. testify that N.H. appeared to be frightened and tormented when Hamlin was calling. J.H. testified that N.H. appeared to be harassed, annoyed, tormented, and alarmed by the calls, and she explained that Hamlin threatened to burn down her home. In addition, the jury heard the voicemails Hamlin left on the phone and heard that Hamlin called N.H.'s phone 196 times on January 22, 2018, 145 times on January 24, 2018, and 235 times on January 25, 2018.

Viewing the evidence in the light most favorable to the verdict and deferring to the jury's authority regarding the credibility of witnesses and the weight to give their testimony, we conclude that a reasonable factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See* Tex. Penal Code Ann. §§ 42.07(a)(4), 42.072(a)(1); *Brooks*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Penagraph*, 623 S.W.2d at 343. Accordingly, we overrule issue one.

## ISSUE TWO

In issue two, Hamlin argues that the trial judge erred by admitting evidence of extraneous offenses. We review a trial court's admission of extraneous offenses or acts under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We must uphold the trial court's ruling if it is within the

11

zone of reasonable disagreement. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002).

> At the beginning of the trial, the trial judge stated as follows:

> There [were] some off-record discussions about the . . . history of interactions between Mr. Hamlin and the complainant . . ., there are . . . some extraneous incidents that led up to the . . . charged incident from January 22nd and January 25th in the indictment. I think based upon the type of charge and just kind of common sense how these kind of circumstances arise, it is the ruling of this Court that the State be allowed to go into these extraneous matters in front of the jury to establish the history of the relationship. And, also, it goes . . . to the defendant's intent and motive in this matter.

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely objection that stated the grounds for the ruling sought with sufficiency to make the trial court aware of the complaint. Tex. R. App. P. 33.1(a)(1). The trial judge's comments do not mention Rules 403 or 404(b) of the Texas Rules of Evidence, nor do they indicate the content of the off-the-record discussions that occurred or the specific acts to which defense counsel referred off the record.

Assuming without deciding that Hamlin properly preserved error, he still does not prevail on issue two. Rule 404(b) of the Texas Rules of Evidence provides that evidence of a crime, wrong, or other act is not admissible to prove a person's character to show that the person acted in accordance with the character on a particular occasion, but it may be admissible for another purpose, "such as proving

12

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b). The list of enumerated purposes for which an extraneous offense may be admissible under Rule 404(b) is neither exclusive nor exhaustive. *Montgomery*, 810 S.W.2d at 388. Evidence of extraneous acts may be admissible if it has relevance apart from its tendency to prove a person's character to show that he acted in conformity therewith. *Id*. at 387. However, the fact that evidence of extraneous acts is introduced for a purpose other than character conformity does not, standing alone, make the evidence admissible. *See Webb v. State*, 36 S.W.3d 164, 180 (Tex. App.—Houston [14th Dist.] 2000, pet, ref'd). Proffered evidence must also be relevant to a fact of consequence in the case. *Id*. Evidence is relevant if it tends to make the existence of any fact of consequence more probable or less probable than it would be without the evidence. Tex. R. Evid. 401.

Rule 403 of the Texas Rules of Evidence provides as follows: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389. Once a trial court determines that extraneous

13

offense evidence is admissible under Rule 404(b), the trial court must, upon proper objection by the opponent of the evidence, weigh the probative value of the evidence against its potential for unfair prejudice. *Id*.; *see* Tex. R. Evid. 403.

> [A] Rule 403 analysis must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). However, if the only value of extraneous offense evidence is to show character conformity, the balancing test required by Rule 403 is obviated because the "rulemakers hav[e] deemed that the probativeness of such evidence is so slight as to be 'substantially outweighed' by the danger of unfair prejudice *as a matter of law*. *Montgomery*, 810 S.W.2d at 387 (quoting *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978)).

We will not overturn a conviction if, after an examination of the entire record, we have fair assurance that the erroneous admission of extraneous-offense evidence either did not influence the jury or had but slight effect. *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). When the trial court provides a limiting instruction regarding the jury's consideration of extraneous offense evidence, we presume that

the jury followed the trial court's instructions. *See Renteria v. State*, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006).

Based on the record as a whole, we conclude that the trial court did not err by admitting the extraneous offense evidence because it was relevant to show Hamlin's motive and intent. *See* Tex. R. Evid. 404(b)(2); *Montgomery*, 810 S.W.2d at 387. We also conclude that the trial court did not err by implicitly determining that the evidence did not tend to suggest deciding the case on an improper basis or confuse or distract the jury. *See* Tex. R. Evid. 403; *Gigliobianco*, 210 S.W.3d at 641-42. Furthermore, the trial court gave the jury a limiting instruction, and we presume that the jury followed the trial court's instructions. *See Renteria*, 206 S.W.3d at 707. After examining the entire record, we have fair assurance that the admission of extraneous-offense evidence either did not influence the jury or had but slight effect. *See Taylor*, 268 S.W.3d at 592-93. Accordingly, we overrule issue two and affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

15

Submitted on April 6, 2020
Opinion Delivered October 28, 2020
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.