In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00384-CR**
**NO. 09-23-00385-CR**

_____

**BRYCE LAWRENCE CEASER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause Nos. F22-39369 and 23DCCR0219**

_____

**MEMORANDUM OPINION**

A jury convicted Bryce Lawrence Ceaser of Injury to a Child and Aggravated

Assault Causing Serious Bodily Injury, both first degree felonies. *See* Tex. Penal

Code Ann. §§ 22.04, 22.02(a)(1). The jury then assessed Ceaser's punishment at

thirty years imprisonment in the Texas Department of Criminal Justice. The trial

court sentenced Ceaser accordingly and ordered that the sentences be served concurrently.

In two issues on appeal, Ceaser challenges the trial court's evidentiary rulings and the sufficiency of the evidence to support his convictions. We affirm.

## Background

### Caleb Fenter

Caleb Fenter testified and described his education, training and experience as a paramedic with Beaumont Fire and EMS. Fenter recalled that on December 3, 2021, he was dispatched to respond to a "breathing problem" at an apartment in Beaumont. When he and his partner arrived at the apartment, they were led to a back bedroom where Fenter observed an eleven-month-old female infant lying on the bed, while another similarly aged infant played on the bed. He also noticed Cheez-It crackers and crumbs on the floor by the bed. The infant lying on the bed was identified as Kim.[1] He assessed Kim and determined that she was awake, breathing, and had a pulse, but she did not respond to external stimuli as a normal eleven-month-old would. According to Fenter, Kim responded only to painful stimuli, and her eyes would not track movement. Fenter testified this could reflect several things,

---

[1] We refer to the victim and her family members by pseudonyms to conceal their identities. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

2

including a brain injury, depending on the child's medical history. Fenter observed that Kim's pupils were "equal" but "sluggish" and not responding as normal pupils should. Although Kim was moving, "she wasn't making purposeful movements." Kim was taken to the ambulance for further assessment. Fenter testified "her lungs were clear[,] [and] [s]he was breathing on her own adequately. Her oxygen saturation was good. Her blood pressure was good. She just was very, very lethargic." Ceaser told Fenter that Kim had choked on some "Cheez-Its or crackers" but Fenter did not observe anything in her airway or any residue in her mouth. While en route to the hospital, Fenter observed that Kim was no longer as responsive and one pupil was larger than the other which could be "indicative of a head injury or brain bleed." After Kim was transferred to the nursing staff at the hospital, Fenter went back into service.

During cross-examination, Fenter described Ceaser as "upset[,]" and he agreed Ceaser did not try to stop the paramedics from treating Kim that day. He also testified Ceaser told him he hit Kim at one point with "back blows like he was trying to clear the airway and kinda shook the baby because [she] wasn't responding normal[ly]."

**Christopher Isenblitter**

Christopher Isenblitter is a paramedic with the City of Beaumont Fire Department who was dispatched to a call regarding a "medical assist" on December

3

3, 2021. When he arrived, Kim's mother was in the front yard of the apartment complex, "frantic[,]" and asking them to help her child. He entered the apartment, went into a bedroom, and observed Kim on the bed along with another infant. Kim was not acting normally for a child her age, and she was "kinda laid back…didn't seem to be very active, was very lethargic." He observed a bowl of Cheez-Its on the floor but did not notice any remnants of crackers on Kim. Ceaser told Isenblitter that Kim was choking and that "he gave her backslaps and what we call, you know, abdominal thrusts." According to Isenblitter, Kim did not appear to be a victim of choking, noting:

> Typically[,] when a child's choking, you know, unless they have a full blockage, they can still move air pretty well, right? They're normally crying, even despite the choking. The lethargy is kind of what led us to believe there was more to the story than just choking, along with the posturing and just the general presentation of the patient. Along with that, we didn't notice anything in the airway. Her airway was clear. Her lung sounds were clear when we listened to them.

Kim was then transported to the hospital. During the ride to the hospital, Isenblitter observed what he called "posturing" from Kim.

> [W]e believe that she had suffered a head injury. What happens is as the brain suffers trauma, the -- either blood or trauma in that area increases the intracranial pressure on the brain and then can push the brain and the brainstem through the foramen magnum of the skull (indicating). And when that happens, you can get things like posturing, and it's usually indicative of a head injury. The victim or patient will normally extend their extremities outward, including their feet and hands in and out a posture like this (indicating).

4

Isenblitter testified he stayed at the hospital to observe Kim's brain scan which showed trauma to the brain.

**Madison Stewart**

Madison Stewart is a registered nurse with St. Elizabeth Hospital in Beaumont and works in the emergency room. On the day Kim was brought to the hospital, she was rushed to the "front of the line" and immediately treated. Due to possible head trauma, Kim was sent for a CT which revealed she had a brain bleed. Stewart later learned Kim also had a skull fracture. According to Stewart, the medical team was unable to stabilize Kim, and within approximately thirty minutes after the CT, she passed away. Medical records from that day were admitted as evidence. Stewart testified that Kim had "significant" injuries, including "brain bleed with a shift[,]" and that these injuries "absolutely" could have caused Kim's death. She provided the following explanation regarding Kim's injuries, including the brain "shift[,]" and her death:

> The swelling that causes -- to have a brain bleed, you know, your head is encased in your skull and you don't have very much room. And, so, the bleeding causes significant pressure on the brain and causes you to lose simple reflexes like breathing -- that was probably the No. 1 thing that we started focusing once we saw the CT and the brain bleed. I think when we pulled her off, she started posturing, which is also indicative of a brain bleed. And once they start doing that, then they can lose their airway, and that's what we're concerned about. Like I said earlier, we --we get information[,] and we prioritize and we get new information and re-prioritize. So, we started to secure her airway because we knew that she was going to lose it, but that's inevitable with brain bleeds,

5

especially significant ones with shifts. They just -- their brain doesn't have the ability to tell the body what it needs to do, like breathe.

[…]

So, the place where the brain is bleeding at, there's … so much fluid and force that -- you have two hemispheres of your brain and a midline. And then so there's so much pressure on this side, it causes the whole brain to shift this way (indicating).

During cross-examination, Stewart testified that she observed bruising near one of Kim's eyes, and that she would not expect to see bruising or a skull fracture from shaking, chest compressions, or hitting her back to dislodge something within her throat.

**Rachel Thomas**

Rachel Thomas is a forensic nurse who examined Kim when she arrived at the hospital on December 3, 2021. Due to Kim's age and medical condition, Thomas spoke to Kim's mother and Ceaser to gather information about the events that lead to Kim's hospitalization. Thomas read the following from her report regarding what was conveyed to her by Ceaser:

We've been trying to get our life together. Our sleep schedule is so off. We be up until 4:00 in the morning 'cause she used to work the nightshift in the hospital. My mind just keeps going and going and going. The last few weeks I've been having the most vivid dreams. People dying, people getting shot, people shooting at me, people I don't even know. My nerves be bad. I used to smoke, like, one Black a week. Now I have been smoking like three or four Blacks a day. My nerves been bad. My spiritual nerves been bad. Something's not right. Like, even our sexual life has been off. [Kim's mother] went to work at, like,

6

12:00. I don't know the time stuff happened. I can just tell you what happened.

. . .

[]You have to know [Kim]. Every time she see food, she, like -- when I have something in parenthesis I'm describing what I saw or, like, motions that the person I'm speaking to did. And, so, he quickly moved his hand to the floor and then mimicked grabbing hand-fulls of something and brings it to his -- brings his hand to his mouth. So, just grasping things and putting things to his mouth.

[]Just -- and then, again, he makes like a gulping sound -- she starts choking every time. She stuffs her mouth. I was in bed with my other daughter [Betsy.]

…

We call her "[Betsy]." She's been teething -- and he was unable to give any information about her age.

[]So[,] she just laid on me and took a nap. We were just chillin'. [Kim] was sitting on the floor chillin'. Before I could get out of the bed to go play the game, she woke up and started crying. I put her on the floor next to [Kim]. I was like, you know, you haven't had no food since last night. Let me get her something. The Cheez-Its were already in the room. [Kim] was just looking around. I put some in her bowl, and I put one out, and she took it with her hand. She took the other hand and get some with her other hand and she started eating. I went and laid on the bed. I heard a gulp sound, the normal sound [Kim] makes. I jumped up and said, [Kim]. She look[ed] at me. She had food halfway in her mouth and she took it out. I wa[l]ked in the kitchen. I went and poured her a bottle of milk. All I hear is a noise. I go in the other room, was like, [Kim, Kim]. And it's not coming up. I leaned down and was patting on her back -- and he demonstrated a patting motion.

. . .

7

[]When she started choking, I picked her up -- and he demonstrates hand -- his hands were in front of his chest in kind of a semicircle position and begins moving his hands back and forth.

[]I used to work in the hospital and security in Port Arthur. They make you take this course and there's a certain way to do things with the baby. I laid her down on the bed and was doing the -- and he demonstrates his hands in a semicircular position and his thumbs facing the ceiling and he's pressing his thumbs up and down.

[]My baby is dead. I'm try[ing] to get [Kim] to breathe. I'm shaking, trying to get her breathing rhythm right. I put her down. I have to go get a cold towel. I don't run the AC in the house[,] and she was the kind of baby that gets hot. I put it on her chest and her face and her feet. She's hot and she's not breathing. I had done called -- man -- I was on the phone. I couldn't think of the address[,] so I went and got it off a piece of mail. Then they put the ambulance people on the phone. I was telling them what I was doing. She's breathing. She's never really stopped breathing. I just kept getting the feeling something wasn't right. When we were at home, the man made it sound like she was okay when I was giving her -- when I was giving my baby breaths. I could see it in her eyes[.] . . .

[]She has a look like there wasn't before. Her eyes were open[,] but it was like she wasn't on the Earth anymore.

. . .

[]I was blowing in her mouth. It was hot in there. I'm by myself. My other baby's crying. It's, like, 72 degrees in there. I'm hot. I'm doing the best I can for her. I was so scared. My baby was dying. What am I gonna do? [Mother] is a first-time mom. My baby is dead.

Thomas testified Ceaser never reported that Kim's skull was injured, or that she had an accidental fall or head injury. Thomas performed a postmortem examination of Kim's body and documented any injuries. She noted a bruise on

8

Kim's right shoulder and bruises on the left side of her head near her temple. She also documented an injury to Kim's left eye. She also observed "petechiae[,]" which she described as "tiny almost bruises. It's areas where the tiny capillaries that are very superficial rupture, and it causes, like, almost like polka dot, freckles of blood pooling under the tissue[.]" Thomas testified this type of injury could indicate a blow to the face, but more likely strangulation or shaking.

**William McClain**

William McClain is a senior associate medical examiner forensic pathologist with the Forensic Medical Management Services. Although he did not perform the autopsy on Kim, he reviewed the autopsy and report, a copy of which was admitted at trial along with pictures taken during the autopsy. According to McClain, the report identified external and internal injuries, including hemorrhages on the brain surface and an "L-shape fracture that is at the base of the right side of the skull[.]" McClain testified, "Shaking won't introduce a skull fracture. There must have been an impact there." Regarding the amount of force needed to cause such an injury, McClain testified:

> I'm not able to give any estimate as far as a numerical value of torque or foot pound or any other unit of force other than to say that babies of this age roll off beds on the hard floors, they're involved in car crashes in their car seats, they get conked on the head by their siblings, those sorts of things and don't get skull fractures. So, this force was more than that in order to have caused this skull fracture.

. . .

> So, you know, with that part of the bone being fractured, that is this area again, as I described earlier, is you go from sort of the up and down part of the back of the head and then curl under (indicating). So, that's on one of the knobs here underneath on the underside of the skull. So, there must have been a force applied to that area either striking that area or that area striking a surface or an object.

The autopsy concluded Kim's cause of death was "[a]busive head trauma[,]" which resulted in a subdural hematoma that caused a brain bleed. McClain agreed with this conclusion based on his review of the report and pictures taken that day, opining the "manner of death to be homicide[.]" During cross-examination, McClain testified that it could be "possible" for someone to fracture the back of an infant's skull using the person's hand.

**Patricia Beach**

Patricia Beach is a pediatrician who for the past eight years has been working at the University of Texas Medical Branch in Galveston as a general pediatrician in charge of child abuse cases. She also consults with the Department of Family and Protective Services. Beach consulted on Kim's case for the purpose of evaluating whether the injuries could have been due to natural causes. Beach was provided copies of Kim's medical records and photographs of Kim that had been taken in the emergency room. Beach testified that in reviewing the photos the "most impressive thing was that the child appeared to have what was a handprint on the upper -- the

side of her face on the left and bruises that ran along the sides of what would appear to be fingers because of the configuration of the bruise." She detailed the bruises on Kim's body, including bruises on her face, arm, and forehead. According to Beach, the bruise on Kim's shoulder and the bruise on her head likely resulted from two different impacts. Beach was unaware when she reviewed Kim's medical records that Kim had a skull fracture because it was not revealed on the CT scan. Beach concluded after her review that "the child sustained at least one very serious blow to the head and that there was also a bruise on the shoulder on the opposite side." After reviewing Kim's autopsy report in preparation for trial, Beach testified:

> It just reinforces what we thought was there. There's bleeding inside the brain, over the surface of the brain that's clearly not natural. It's a traumatic injury. There's a lot of bleeding at the base of the brain, which I did not appreciate[,] and it is not at all unusual for a CAT scan to be a [poor] imager. It doesn't show the base of the brain as well as certain other studies. It's a very hard area to image. And, so, I was able to see that. That then, in fact, enforces -- reinforces the sort of history that happens when an infant sustains trauma to the brain. One of the things they often do is they quit breathing. So, a blow to the back of the head is very close to the areas that control respiration and heartbeat, and, so, it explained to me to an extent the damage that was done in this child's brain. Because not only had she sustained a blow and bleeding, she also probably had some compromise to her respiratory effort. And then as the brain swelled and there were further pressures, that got worse and worse.

Beach stated that she could not tell the intent of the person that inflicted the injuries on Kim but classified the force used as abusive. On cross-examination, Beach testified she believes Kim was hit with an open hand, and while the injury to

11

her skull would be very hard to do with an open hand, this was not the only thing that happened to Kim.

**Mother**

Mother testified Kim was almost a year old at the time of her death. On December 3, 2021, Mother left to go to her second day at a new job. She had been in a relationship with Ceaser for about four years and had been living with him for three months. When she left Kim and Betsy with Ceaser around 11:40 that morning, both children were awake and healthy. Shortly after arriving at work, she started to communicate with Ceaser, via text message and a FaceTime call. Copies of the text messages were admitted at trial. Mother described the text messages and Ceaser's state of mind that day, testifying he was "[o]ut of it[,]" "[o]ut of his mind[,]" and stressed about not having a job.

When Ceaser FaceTimed Mother "he flipped the camera over and I seen [Kim] laying on the bed just like, lifeless, like, just laying there." Ceaser told Mother that there was an emergency, Kim was having a seizure, and that she needed to come home immediately. Mother described how she found Kim upon arriving back at the apartment:

> Well, I was in shock seeing my child like that for one knowing that I left her and seeing her playing and laughing. So, after that, I proceeded to call her, like, you know, Momma here, like, can you hear me. And then she moved a little bit but it still wasn't like she -- she couldn't shake it, like, she was just hurting.

12

. . .

It was just a little hand twitch, foot twitch, and that was it. That was the last thing I seen, and then we went to the hospital.

According to Mother, Ceaser was "[p]anicking" and told her that Kim choked on a Cheez-It. This was different than what he told Mother on the phone.

After Kim passed away at the hospital, Mother was interviewed by law enforcement. Mother described a prior injury on Kim from the day before while Kim was in Ceaser's care. According to Mother, Kim had a red mark, like a mosquito bite without a bump. Ceaser said that when she woke up from a nap, he picked her up and Kim hit her head on the door. Mother had no reason to question the explanation until the next day when Kim died.

**Daniel Norsworthy**

Officer Daniel Norsworthy is currently a patrol officer with the Beaumont Police Department, but prior to his current assignment, he was an investigator with the Special Crimes Unit which investigates physical and sexual crimes committed against children. Norsworthy testified he is certified in cell phone extraction and he performed a cell phone extraction on Ceaser's cell phone which found texts message between Ceaser and Mother and Ceaser and a person saved in his contact as

"Orange[.]"[2] The messages show that Ceaser was texting this woman the day before and on the day Kim died. In some of the messages sent between approximately 11:50 am and 12:30 pm, on the day Kim died, Ceaser tells Orange "This teething shit is dumb[,]" "I been up since 4:00 in the morning[,]" and "Man, I'm running on three hours of sleep." The messages also say Ceaser can't "hit no licks[,]" or "get a haircut." In messages exchanged between Mother and Ceaser from 12:15 to 1:30 pm on the day Kim died, Mother and Ceaser discuss their sexual relationship, and Ceaser states, "[m]y depression been kicking in[,]" "happiness is leaving[,]" and "[m]y self confidence is leaving[.]"

**Frank Coffin**

Frank Coffin is a detective with the Beaumont Police Department. Coffin led the investigation into Kim's death and interviewed Ceaser for several hours on December 3 and 4, 2021. A copy of the interview was played for the jury. Coffin testified that during the interview, Ceaser was more concerned with himself than Kim, and it appeared "[t]his was a major inconvenience for him." According to Coffin, Ceaser spoke for a long time, almost without interruption. The officers then left, and when they returned, Ceaser told them he was going to tell them the "absolute truth." To Coffin, that statement implied Ceaser had been lying to the officers.

[2]Mother testified that she knows a person named "Orange[,]" and that this person is the mother of one of Ceaser's children.

14

Ceaser then admitted to "popping" Kim more than once while she was crying. Ceaser then demonstrated using his hand to hit Kim's back. At the conclusion of the interview, Coffin believed Ceaser should be arrested based on the totality of this investigation. Coffin based his opinion on speaking to medical professionals, searching Ceaser's phone records and apartment, and viewing Kim's autopsy. Coffin testified that Kim had "[o]ne of the most significant injuries I have ever seen[,]" and he concluded that Kim "[a]bsolutely" died of those injures. During cross-examination, Coffin agreed that Ceaser was upset during the interview, and that he did not believe that Ceaser woke up that morning with the intent to kill Kim.

At the conclusion of trial, the jury convicted Ceaser of both counts and subsequently sentenced him to thirty years incarceration, which the trial court ordered to be served concurrently. Ceaser timely appealed.

**Analysis**

*Sufficiency of the Evidence*

We begin our review with the issue that would afford Ceaser the most relief on appeal – his challenge to the sufficiency of the evidence supporting his conviction for Bodily Injury to a Child.[3] A person commits this offense by intentionally, knowingly or recklessly causing bodily injury or serious bodily injury to a child.

---

[3]Ceaser does not challenge the sufficiency of the evidence supporting his conviction for Aggravated Assault causing Serious Bodily Injury.

15

Tex. Penal Code Ann. § 22.04(a). The trial court's charge appropriately tracked this language, and the jury found Ceaser guilty of intentionally or knowingly causing bodily injury rather than the lesser-included offense of recklessly causing bodily injury. *See id.*

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id.* Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id.* at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

16

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761–62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

Mother testified she left Kim in Ceaser's care at which time Kim was in a healthy, normal condition. It is undisputed Ceaser was the only adult with Kim from the time Mother left until the time she returned to find Kim severely injured. Medical experts testified Kim's injuries, which included a fractured skull, were consistent with recent, significant trauma. "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd). The jury was not required to accept as true Ceaser's proffered explanations that Kim choked on Cheez-Its and that he was merely trying to administer aid. As sole judge of the weight and credibility of the testimony, the jury could reasonably

17

believe Ceaser intentionally or knowingly caused Kim's injuries. *See Hooper*, 214 S.W.3d at 13. Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found each of the essential elements beyond a reasonable doubt. We conclude the evidence is sufficient to support the jury's verdict that Ceaser committed the offense of injury to a child. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *Garcia*, 16 S.W.3d at 405; *see also* Tex. Penal Code Ann. § 22.04(a). We overrule Ceaser's second issue.

*Evidentiary Issue*

Next, we consider Ceaser's first issue in which he challenges the admission of Mother's testimony that she observed a mark on Kim's head the day before her fatal injuries. Texas Rule of Evidence 404(b) "codifie[s] the common law principle that a defendant should be tried only for the offense for which he is charged and not for being a criminal generally." *Rogers v. State*, 853 S.W.2d 29, 32 n.3 (Tex. Crim. App. 1993); Tex R. Evid. 404(b). The rule provides, in pertinent part:

> (1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) *Permitted Uses*; *Notice in Criminal Case*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Tex. R. Evid. 404(b).

18

We review a trial court's admission of extraneous offense evidence under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will not disturb the trial court's ruling unless it is outside the zone of reasonable disagreement. *Id*. A Rule 404(b) analysis consists of two steps. *Rogers*, 853 S.W.2d at 32. First, we must determine whether the evidence is relevant, which according to Rule 401 means the evidence must have some tendency to make a fact that is of consequence in the case more or less probable than it would be without the evidence. *Id*.; Tex. R. Evid. 401. "Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court. An appellate court owes no less deference to the trial judge in making this decision than it affords him in making any other relevancy determination." *Moses*, 105 S.W.3d at 627.

Ceaser's statements to Thomas and Coffin that Ceaser was shaking Kim or patting her on the back in an attempt to render aid to her as she was choking could reasonably be understood as assertions by Ceaser that Kim's injuries were the result of an accident or mistake, rather than intentional or knowing conduct on his part. Evidence that Kim sustained visible signs of injury two days in a row while in Ceaser's care tends to make Ceaser's explanations less plausible. Therefore, the trial court was within its discretion to decide such evidence was relevant to the elements of intent and knowledge.

19

The second step in our review of the trial court's ruling requires us to determine whether the evidence falls within Rule 404(b)'s non-exhaustive list of "permitted uses." *Rogers*, 853 S.W.2d at 32 (explaining two-step analysis); *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) ("Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses."). The rule specifically allows for the admission of evidence for the purpose of proving "intent," "knowledge," "absence of mistake, or lack of accident." Tex. R. Evid. 404(b). As indicated above, the evidence had a tendency to prove knowledge or intent and to negate mistake or accident. Therefore, we conclude the trial court was within its discretion to decide the evidence was admissible under Rule 404(b).

However, our analysis cannot end there, because when the evidence was offered Ceaser's counsel also objected that its probative value was outweighed by its prejudicial effect. Evidence admissible under Rule 404(b) is still inadmissible "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id*. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). "Rule 403 requires exclusion of evidence only when there exists a clear

20

disparity between the degree of prejudice of the offered evidence and its probative value." *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001).

The trial court expressly found the evidence's probative value outweighed any prejudicial effect. Rule 403 gives trial courts "considerable discretion[,]" and we give the trial court's determination "significant deference." *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007); *Odom v. State*, No. 09-14-00070-CR, 2015 Tex. App. LEXIS 11828, at *14 (Tex. App.—Beaumont Nov. 18, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *Moses*, 105 S.W.3d at 627). When reviewing a trial court's Rule 403 ruling, we consider the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). The first two factors weigh in favor of admission, because as indicated above, the evidence was probative regarding the elements of intent and knowledge, and the State established a need for the evidence to rebut Ceaser's assertions of mistake or accident. Regarding the last four factors, the party opposing admission of the evidence bears the burden to demonstrate that the danger of unfair prejudice

21

substantially outweighs the probative value. *See Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Unfair prejudice does not mean simply that the evidence injures the opponent's case. *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999) (citation omitted). "Rather[,] it refers to an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. (quoting *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993)) (internal quotations omitted).

Ceaser did not demonstrate that admitting the evidence would probably lead the jury to decide the case on an improper basis. Generally, the danger in admitting this type of evidence is that the factfinder will conclude that a person did something on the occasion in question simply because the person did the same thing or something similar in the past. Here, there was little risk the jury would use this evidence for this purpose, because Ceaser had already admitted he "popped" Kim multiple times on the day in question. Ceaser also did not establish that the evidence was likely to confuse the jury or distract it from the main issues. Mother testified the injury on the previous day appeared almost like a mosquito bite without the bump. There is little reason the jury would have given this testimony undue weight when medical experts provided the jury detailed testimony about Kim's injuries, including a skull fracture and bleeding in the brain, on the day in question. The record indicates presentation of the evidence about the previous day's injury did not consume an

inordinate amount of time. Even if the evidence had any potential for prejudicial effect, Ceaser did not demonstrate that any such prejudice would substantially outweigh its probative value.

Giving the trial court's ruling the deference to which it is entitled, we conclude the trial court did not abuse its discretion in overruling Ceaser's objections and admitting the testimony. That said, we also conclude that even if the trial court erred in admitting the testimony, any harm was cured by the trial court's limiting instruction:

> During the trial you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. The State offered the evidence to show intent, knowledge, absence of mistake and/or lack of accident. You are not to consider that evidence at all unless you find beyond a reasonable doubt that the defendant did, in fact, commit the wrongful act. Those of you who believe the defendant did the wrongful act may consider it. Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purpose I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific limited purpose I have described. To consider this evidence for any other purpose would be improper.

"We presume that the jury follows [the trial court's] instructions." *Renteria v. State,* 206 S.W.3d 689, 707 (Tex. Crim. App. 2006). After examining the record as a whole, we have fair assurance any error in admitting this evidence did not affect Ceaser's substantial rights and must be disregarded. *See* Tex. R. App. P. 44.2(b);

23

*Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). We overrule Ceaser's first issue.

Having overruled Ceaser's issues on appeal, we affirm the trial court's judgments.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on June 26, 2025
Opinion Delivered August 20, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.